People v Suazo (2018 NY Slip Op 08056)

People v Suazo

2018 NY Slip Op 08056 [32 NY3d 491]

November 27, 2018

Stein, J.

Court of Appeals

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected through Wednesday, March 13, 2019

[*1]

The People of the State of New York, Respondent,
v
Saylor Suazo, Appellant.

Argued October 10, 2018; decided November 27, 2018

People v Suazo, 146 AD3d 423, reversed.

{**32 NY3d at 493} OPINION OF THE COURT

Stein, J.
The Sixth Amendment of the United States Constitution guarantees that a defendant will be judged by a jury of peers if charged with a serious crime. Today, as a matter of first impression, we hold that a noncitizen defendant who demonstrates that a charged crime carries the potential penalty of deportation—i.e. removal from the country—is entitled to a jury trial under the Sixth Amendment.{**32 NY3d at 494}
I.
Defendant Saylor Suazo was charged with assault in the third degree, unlawful imprisonment in the second degree, criminal obstruction of breathing or blood circulation, endangering the welfare of a child, menacing, and harassment in the second degree. As detailed in the accusatory instrument, the charges arose from an incident during which defendant grabbed the mother of his children, threw her to the floor, placed his hands around her neck and squeezed—thereby obstructing her breathing—and then struck her numerous times in the head and neck with his fist. A month later, defendant was also charged with criminal contempt in the second degree due to his violations of an order of protection that directed him to refrain from any communication or contact with the victim.
[*2]
Immediately before the start of trial on the consolidated charges, the People moved, in open court, to reduce the class A misdemeanor charges to attempt crimes. As reduced, the charges against defendant constituted class B misdemeanor crimes and lower grade offenses, with the misdemeanors punishable by a maximum authorized sentence of three months in jail; consequently, as the criminal action was commenced in New York City, the offenses were triable without a jury pursuant to CPL 340.40. Supreme Court refused to entertain defendant's argument in opposition to the reduction, granted the People's motion, and commenced the bench trial.
Defendant persisted and submitted a written motion asserting his right to a jury trial. In support of his motion, defendant asserted that he was a noncitizen charged with deportable offenses, and he argued that the possibility of deportation upon conviction rendered the class B misdemeanors sufficiently serious to mandate a jury trial under the Sixth Amendment. The People did not dispute defendant's assertions that he was a noncitizen or that the charges against him included deportable offenses. Instead, the People opposed defendant's motion on the sole ground that deportation is a collateral consequence arising out of federal law that does not constitute a criminal penalty for purposes of the Sixth Amendment right to a jury trial.
Supreme Court effectively denied defendant's motion and, following a bench trial, found defendant guilty of attempted assault in the third degree, attempted criminal obstruction of{**32 NY3d at 495} breathing or blood circulation, menacing in the third degree, and attempted criminal contempt in the second degree. Upon defendant's appeal, the Appellate Division affirmed the judgment and held that deportation is a collateral consequence of conviction and, as such, does not trigger the Sixth Amendment guarantee of a jury trial (146 AD3d 423 [1st Dept 2017]). A Judge of this Court granted defendant leave to appeal (29 NY3d 1087 [2017]), and we now reverse.
II.
The Sixth Amendment of the United States Constitution provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed." This constitutional guarantee of the right to a jury trial "reflect[s] a profound judgment about the way in which law should be enforced and justice administered" (Duncan v Louisiana, 391 US 145, 155 [1968]). More specifically, the mandate embodies "a fundamental decision about the exercise of official power—a reluctance to entrust plenary powers over the life and liberty of the citizen to one judge or to a group of judges," and an "insistence upon community participation in the determination of guilt or innocence" due to fears of unchecked power (id. at 156). In this regard, the right to a jury trial is intended to ward against "oppression by the Government" (id. at 155) by interposing between the defendant and the accuser a jury of laypeople who "are less likely to function or appear as but another arm of the Government" (Baldwin v New York, 399 US 66, 72 [1970]).
Although the Federal Constitution speaks in absolute terms, it is well settled that the right to a jury trial "does not extend to every criminal proceeding" (District of Columbia v Clawans, 300 US 617, 624 [1937]; see Lewis v United States, 518 US 322, 325 [1996]). "At the time of the adoption of the Constitution[,] there were numerous offenses, commonly described as 'petty,' which were tried summarily without a jury" (Clawans, 300 US at 624). Thus, while the Sixth Amendment "requires that defendants accused of serious crimes be afforded the right to trial by jury[,] . . . so-called 'petty offenses' may be tried without a jury" (Baldwin, 399 US at 68).
As explained by the United States Supreme Court, to determine whether an offense is serious or petty, "courts at one time looked to the nature of the offense and whether it was triable{**32 NY3d at 496} by a jury at common law" (Lewis, 518 US at 325). Eventually, "[s]uch determinations became difficult, because many statutory offenses lack common-law antecedents. Therefore, more recently, [courts] have instead sought 'objective indications of the seriousness with which society regards the offense' " (id. at 325-326 [citation omitted], quoting Frank v United States, 395 US 147, 148 [1969]; see Blanton v North Las Vegas, 489 US 538, 541 [1989]). The Supreme Court has since instructed that the "most relevant . . . criteri[on]" for evaluating the seriousness of an offense is "the severity of the maximum authorized penalty" (Baldwin, 399 US at 68; see Blanton, 489 US at 541; Duncan, 391 US at 159-160). This is because, "[i]n fixing the maximum penalty for a crime, a legislature 'include[s] within the definition of the crime itself a judgment about the seriousness of the offense' " (Blanton, 489 US at 541, quoting Frank, 395 US at 149), and "[t]he penalty authorized by the law of the locality may be taken 'as a gauge of its social and ethical judgments' " (Duncan, 391 US at 160, quoting Clawans, 300 US at 628).
[*3]
Consistent with the Supreme Court's instruction that the maximum potential penalty for a particular offense must be the crux of the analysis as to whether a right to a jury trial exists, significant attention has been paid to the maximum length of incarceration associated with the crime in question. In that regard, the Supreme Court has articulated at least one clear rule based on the potential length of incarceration—namely, "no offense can be deemed 'petty' for purposes of the right to trial by jury where imprisonment for more than six months is authorized" (Baldwin, 399 US at 69) because the possibility of such a penalty being imposed is "sufficiently severe by itself to take the offense out of the category of 'petty' " and place it within the scope of the Sixth Amendment's jury trial protections (id. at 69 n 6; see Blanton, 489 US at 542). Thus, "a defendant is entitled to a jury trial whenever the offense . . . charged carries a maximum authorized prison term of greater than six months" (Blanton, 489 US at 542). Conversely, for offenses punishable by six months' imprisonment or less, the Court has concluded that "the disadvantages of such a sentence, 'onerous though they may be, may be outweighed by the benefits that result from speedy and inexpensive nonjury adjudications' " (Blanton, 489 US at 543, quoting Baldwin, 399 US at 73). Thus, it is "appropriate to presume for purposes of the Sixth Amendment that society views such an offense as{**32 NY3d at 497} 'petty' " (Blanton, 489 US at 543; United States v Nachtigal, 507 US 1, 3, [1993]).
Despite the significance placed on the maximum authorized length of incarceration, the Supreme Court has clarified that the term "penalty," as relevant to the Sixth Amendment jury trial analysis, "do[es] not refer solely to the maximum prison term authorized for a particular offense" (Blanton, 489 US at 542). "A legislature's view of the seriousness of an offense also is reflected in the other penalties that it attaches to the offense" (id.). Thus, courts must "examine 'whether the length of the authorized prison term or the seriousness of other punishment is enough in itself to require a jury trial' " (id., quoting Duncan, 391 US at 161).
To be sure, primary emphasis remains on the maximum authorized period of incarceration; this is because, although other "[p]enalties such as probation or a fine may engender a significant infringement of personal freedom, . . . they cannot approximate in severity the loss of liberty that a prison term entails" (Blanton, 489 US at 542 [internal quotation marks and citations omitted]). Our heightened focus on the authorized prison term does not, however, necessarily render every other penalty that flows from a criminal conviction inconsequential. Thus, where a defendant is charged with an offense subject to a maximum authorized term of incarceration of six months or less but argues that the mandate of the Sixth Amendment nevertheless applies, we must consider additional penalties imposed by law upon conviction. In such circumstances, a "defendant is entitled to a jury trial . . . only if [the defendant] can demonstrate that any additional statutory penalties, viewed in conjunction with the maximum authorized period of incarceration, are so severe that they clearly reflect a legislative determination that the offense in question is a 'serious' one" (Blanton, 489 US at 543; see Nachtigal, 507 US at 3). According to the Supreme Court, "[t]his standard, albeit somewhat imprecise, should ensure the availability of a jury trial in the rare situation where a legislature packs an offense it deems 'serious' with onerous penalties that nonetheless do not puncture the [six]-month incarceration line" (Blanton, 489 US at 543 [internal quotation marks and citation omitted]; see Nachtigal, 507 US at 3-4).
In New York, CPL 340.40 requires that the trial of an information in a local criminal court be a single judge (i.e., nonjury) trial (see CPL 340.40 [1]), unless the information charges any{**32 NY3d at 498} misdemeanors, in which case the defendant "must be accorded a jury trial, . . . except that in the New York [C]ity criminal court the trial of an information which charges a misdemeanor for which the authorized term of imprisonment is not more than six months must be a single judge trial" (CPL 340.40 [2]). Since class A misdemeanors carry an authorized maximum penalty of one year of imprisonment (see Penal Law § 70.15 [1]), both the Sixth Amendment and CPL 340.40 guarantee a jury trial to all defendants charged with such crimes. Further, if prosecuted outside New York City, defendants facing any misdemeanor charges are entitled to a jury trial pursuant to CPL 340.40 (see CPL 340.40 [2]). However, if prosecuted in New York City criminal court, defendants charged with only class B misdemeanor crimes or unclassified misdemeanor crimes subject to a maximum term of six months' imprisonment or less are not statutorily entitled to a jury trial (see CPL 340.40 [2]; Penal Law § 70.15 [2], [3]). Notwithstanding the New York State Legislature's curtailment of the right to a jury trial in crimes not tried upon indictment in this respect,[FN1] "[t]he [*4]deep commitment of the [n]ation to the right of jury trial in serious criminal cases as a defense against arbitrary law enforcement qualifies for protection under the Due Process Clause of the Fourteenth Amendment, and [it] must therefore be respected by the [s]tates" (Duncan, 391 US at 156). Thus, the right of the New York State Legislature to dispense with a jury trial is constrained by the Federal Constitution (see id.; Baldwin, 399 US at 68). Simply stated, the CPL exception providing for nonjury trials of certain misdemeanors in New York City does not serve to deny a defendant subject to that exception the opportunity to establish that the charged crimes are considered serious enough by society, based on the penalties associated therewith, to entitle the defendant to a jury trial as guaranteed by the Sixth Amendment.{**32 NY3d at 499}
III.
Defendant argues that, although the Sixth Amendment right to a jury trial did not automatically attach to the crimes with which he was charged because they are punishable by less than a six-month term of incarceration, he met his burden of establishing that the crimes carry an additional penalty beyond incarceration—namely, deportation—which he contends is a sufficiently severe penalty to rebut the presumption that the crimes are petty for Sixth Amendment purposes. We agree.
Under the Immigration and Nationality Act (INA), a noncitizen may be deported, or forcibly removed from the country, if convicted of a variety of crimes, including a "crime of moral turpitude" under certain conditions, an "aggravated felony," most controlled substance offenses, various firearm offenses, "[c]rimes of domestic violence, stalking, or violation of [a] protection order, [and] crimes against children" (8 USC § 1227 [a] [2] [A]-[F]). In the event of a noncitizen's conviction of such an offense, "removal is practically inevitable but for the possible exercise of limited remnants of equitable discretion vested in the Attorney General to cancel removal for noncitizens convicted of particular classes of offenses" (Padilla v Kentucky, 559 US 356, 363-364 [2010]; see generally 8 USC § 1227 [a] [2]).[FN2]
There can be no serious dispute that, if deemed a penalty for Sixth Amendment purposes, deportation or removal is a penalty of the utmost severity. The deportation process generally involves detention by federal immigration authorities until administrative or judicial review prompts either the detainee's release or an adjudication that the detainee is deportable. Detention—which closely resembles criminal incarceration—may last several days, or it may last months or years (see People v Peque, 22 NY3d 168, 189 [2013], cert denied 574 US —, 135 S Ct 90 [2014]). A noncitizen who is adjudicated deportable may first face additional detention, followed by the often-{**32 NY3d at 500}greater toll of separation from friends, family, home, and livelihood by actual forced removal from the country and return to a land to which that person may have no significant ties.
In light of the gravity of deportation, the United States Supreme Court has characterized it as a "drastic measure" (Padilla, 559 US at 360, quoting Fong Haw Tan v Phelan, 333 US 6, 10 [1948]). That Court "has reiterated that deportation is 'a particularly severe penalty,' which may be of greater concern to a convicted alien than 'any potential jail sentence' " (Sessions v Dimaya, 584 US —, — 138 S Ct 1204, 1213 [2018], quoting Jae Lee v United States, 582 US —, —, 137 S Ct 1958, 1968 [2017]) because, in many circumstances, it "amount[s] to lifelong 'banishment or exile' " from the country that one considers home (Sessions, 584 US at —, 138 S Ct at 1213, quoting Jordan v De George, 341 US 223, 231 [1951]).
Notably, this Court also recently recognized the profound significance of deportation as a consequence of a criminal conviction (see Peque, 22 NY3d at 176). We explained that
"the deportation process deprives the defendant of an exceptional degree of physical liberty by first detaining and then forcibly removing the defendant from the country. Consequently, the defendant may not only lose the blessings of liberty associated with residence in the United States, but may also suffer the emotional and financial hardships of separation from work, home and family. Given the severity and inevitability of deportation for many noncitizen defendants, 'deportation is an integral part—indeed, sometimes the most important part—of the penalty that may be imposed on noncitizen defendants' " (id. at 192, quoting Padilla, 559 US at 364).
Ultimately, the devastating loss that may be occasioned by forced removal is a "loss . . . so great as to be unquantifiable" (Bado v United States, 186 A3d 1243, 1251 [DC 2018]). There can be little doubt that deportation is a sufficiently severe penalty to puncture the six-month demarcation between serious and petty offenses because the loss of liberty associated therewith is analogous to that inherent in incarceration and because deportation—which may result in indefinite expulsion from the country and isolation from one's family—is frequently more injurious to noncitizen defendants than six months or less of imprisonment.{**32 NY3d at 501}
IV.
The People argue that, notwithstanding the profound impact of deportation, removal from the country is not a criminal penalty of a conviction, but merely a civil collateral consequence, which should not be considered a penalty for Sixth Amendment purposes. The People further assert that, in any event, deportation cannot obligate a New York court to furnish a jury trial to a defendant charged with a class B misdemeanor crime because it is a consequence imposed as a matter of federal law and, therefore, does not reflect the New York State Legislature's judgment concerning the seriousness of an offense. We address these arguments in turn.
Although the People are correct that deportation—a federally imposed penalty—is technically a civil collateral consequence of a state conviction (see Padilla, 559 US at 365 [deportation "is not, in a strict sense, a criminal sanction"]), the Supreme Court has explained that "deportation is nevertheless intimately related to the criminal process" and "it [is] most difficult to divorce the penalty from the conviction in the deportation context" (id. at 365-366 [internal quotation marks and citation omitted]). This is because "[o]ur law has enmeshed criminal convictions and the penalty of deportation for nearly a century" (id.) and, "deportation or removal is . . . virtually inevitable for a vast number of noncitizens convicted of crimes" (id. at 360 [citation omitted]). It bears repeating that, while we, too, have posited that deportation "is technically on the collateral side of the direct/collateral divide," we have observed that it is, "because of its close connection to the criminal process, uniquely difficult to [*5]classify as either a direct or a collateral consequence" of a conviction (Peque, 22 NY3d at 190, 192).[FN3] Further, we have noted that deportation "has punitive qualities {**32 NY3d at 502}not entirely unlike the core components of a criminal sentence," and that it is "a virtually automatic result of a New York felony conviction for nearly every noncitizen defendant" (Peque, 22 NY3d at 191). For these reasons we, like the Supreme Court, have acknowledged that "deportation [can]not be neatly confined to the realm of civil matters unrelated to a defendant's conviction" (id. at 190).[FN4]
As we recently observed, following amendments to federal immigration law in 1996, "the federal government deported an ever-growing number of individuals each year" (Peque, 22 NY3d at 188). Moreover, "[c]hanges in immigration enforcement have . . . increased the likelihood that a noncitizen defendant will be deported" following a state criminal conviction, pursuant to the aforementioned INA provisions (id.). This connection between criminal convictions and deportation is readily reflected in immigration enforcement statistics. "With 143,470 administrative arrests in [fiscal year] 2017, [Immigrations and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO)] recorded its greatest number of administrative arrests as compared with the past three fiscal years" (ICE, Fiscal Year 2017 ICE Enforcement and Removal Operations Report at 2, available at https://www.ice.gov/sites/default/files/documents/Report/2017/iceEndOfYearFY2017.pdf [last accessed Oct. 26, 2018], cached at 
http://www.nycourts.gov/reporter/webdocs/ICE2017Rpt.pdf). "The vast majority of ERO's arrests were of convicted criminals or aliens with criminal charges," as almost 128,000—approximately 89% of the arrestees—had either a final conviction or pending charges (id. at 3-4). Tellingly, in fiscal year 2017, ERO issued 142,356 detainers, which are{**32 NY3d at 503} requests that other law enforcement agencies notify immigration authorities and detain noncitizens rather than release them from criminal custody (see id. at 7-8). This connection between the criminal justice system and immigration removal cannot be denied.
Ultimately, even if deportation is technically collateral, it is undoubtedly a severe statutory penalty that flows from the federal government as the result of a state criminal conviction. Indeed, we have characterized it as a "substantial and unique consequence" (Peque, 22 NY3d at 193) of such "tremendous importance, grave impact and frequent occurrence" that we have held that—despite its technically collateral nature—constitutional principles of due process require New York courts to inform a defendant pleading to a felony charge that, if a noncitizen, the defendant may be deported as a result of the plea (id. at 175-176). Similarly, the Supreme Court has extended the constitutional right to the effective assistance of counsel to encompass advice regarding the deportation consequences of a criminal conviction, as "longstanding Sixth Amendment precedents, the seriousness of deportation as a consequence of a criminal plea, and the concomitant impact of deportation on families living lawfully in this country demand no less" (Padilla, 559 US at 374).
In the jury trial context, the Supreme Court has never proclaimed a rule precluding statutory penalties from triggering the mandate of the Sixth Amendment right to a jury trial based on their collateral nature. Indeed, in Blanton v North Las Vegas, the Supreme Court considered at least one consequence of a conviction that could be classified as collateral (489 US at 539-540). While the Supreme Court ultimately determined that "a 90-day [driver's] license suspension is [not] that significant as a Sixth Amendment matter," the Court's analysis in Blanton presumed that a collateral consequence could potentially render an offense serious (id. at 544 n 9; see United States v Jenkins, 780 F2d 472, 474 n 3 [4th Cir 1986]; see also Baldwin, 399 US at 69; Landry v Hoepfner, 818 F2d 1169, 1175 [5th Cir 1987], on reh 840 F2d 1201 [5th Cir 1988], cert denied 489 US 1083 [1989]; United States v Craner, 652 F2d 23, 26 [9th Cir 1981]). Moreover, by holding that defense counsel generally must advise criminal defendants of deportation risks associated with a guilty plea in order to provide effective assistance under the Sixth Amendment (see Padilla, 559 US at 369), the Supreme Court necessarily held, albeit in a different{**32 NY3d at 504} context, that collateral consequences—and, in particular, the consequences attendant to deportation—are not categorically excluded from Sixth Amendment protection (see Chaidez v United States, 568 US 342, 352 [2013]).
Turning to the People's next contention, we also conclude that it is not fatal to defendant's claim that the penalty of deportation or removal from the country is imposed as a matter of federal, rather than state, law. The salient fact is that a legislative body authorized to attach a penalty to a state conviction has determined that the crime warrants the onerous penalty of deportation. That New York State could neither designate nor effectuate this specific penalty does not make it any less onerous. Ultimately, the penalty of deportation reflects society's view that the misconduct underlying the conviction is of the type that violates social norms of proper behavior and stirs community outrage to such an extreme extent that it provides a basis for the convicted person to be exiled from home, family, community, and country. Congress, as the national elected legislative body, is constitutionally authorized to enact our nation's immigration laws and, by virtue of that federal power, it alone decides which federal and state criminal law convictions will carry the additional severe penalty of deportation (US Const, art 
I, § 8). It is that legislative determination that is dispositive to the analysis here. Just as a nationwide consensus was relevant to the Supreme Court's adoption of the six-month incarceration rule, the nation's determination to impose deportation upon certain convicted noncitizens—reflected in the only way it can be, through laws passed by Congress—is the sole "objective [*6]criterion" by which to measure the seriousness of a penalty of federal nationwide application (see Blanton, 489 US at 545 n 11; Bado, 186 A3d at 1257-1258 ["Congress, as the national legislature, is presumed to reflect the nation's social and ethical judgments"]).
To be sure, the Supreme Court has often referred in its Sixth Amendment jurisprudence to the view of the local state legislature regarding the seriousness of a crime as being reflected in the penalties imposed by that legislature (see e.g. Duncan, 391 US at 160). However, the penalties raised by the defendant—and, thus, under consideration by the Court—in such cases, were those imposed by the state of conviction, providing the Supreme Court no occasion to opine on the effect of a penalty imposed by Congress. In other words, those cases do not stand for the proposition that federal penalties that flow{**32 NY3d at 505} from state convictions must be excluded from the Sixth Amendment analysis simply because they are imposed by a legislature other than the local one.[FN5]
Moreover, while the Supreme Court has explained that courts need not look to how other states classify their crimes—as either petty or serious—when undertaking a Sixth Amendment analysis (see Nachtigal, 507 US at 4 [observing that "the statutory penalties in other (s)tates are irrelevant to the question whether a particular legislature deemed a particular offense ' "serious" ' " (emphasis added)]; Blanton, 489 US at 545 n 11), this principle does not apply here. The distinction between penalties imposed by other states is drawn because "the question remains whether those [s]tates are in violation of the Constitution; and . . . that question is not answered by cataloging the practices of other [s]tates" (Martin v Ohio, 480 US 228, 236 [1987], cited in Blanton, 489 US at 545 n 11). Essentially, whether other states classify particular offenses as serious or petty—and the length of incarceration or availability of a jury trial in those states—does not answer the ultimate question of whether the Sixth Amendment guarantees a jury trial for a defendant facing prosecution in a given state; rather, that determination must be made based on the penalties imposed by the state subjecting the defendant to prosecution. This is eminently rational, as a defendant in one state will not be subjected to the penalties imposed by other states for like crimes.
Here, we are considering the federally-imposed penalty of deportation, which both this Court and the Supreme Court have recognized is a penalty that is often a "virtually inevitable" (Padilla, 559 US at 360), or practically "automatic," result of many New York convictions (Peque, 22 NY3d at 191). Inasmuch as federal deportation will almost invariably flow{**32 NY3d at 506} from certain New York state convictions, we see no persuasive reason to exclude it from the constitutional inquiry of whether the penalties of a crime are severe enough to warrant extending the protections of a jury trial (see Bado, 186 A3d at 1258 ["(t)here is no reason grounded in the purpose of Blanton's penalty-based analysis to exclude (deportation) from Sixth Amendment consideration the serious penalty of removal that attaches to [*7]a criminal conviction, and to which the accused is exposed, because it has been imposed by Congress rather than the local legislature"]).[FN6] We, therefore, conclude that the Sixth Amendment mandates a jury trial in the "rare situation" where a legislature attaches a sufficiently "onerous" penalty to an offense (Blanton, 489 US at 543), whether that penalty is imposed by the state or national legislature.[FN7]
The People's remaining arguments are also unavailing. To the extent the People contend that the Sixth Amendment does not permit a distinction between the right to a jury trial for citizens and noncitizens, we have no occasion to address—on this appeal involving a noncitizen subject to deportation—whether a citizen would likewise be entitled to a jury trial{**32 NY3d at 507} when charged with an otherwise deportable offense.[FN8] Further, we have previously rejected the People's contention that the purported uncertainty of deportation renders it too speculative a basis upon which to award Sixth Amendment protection (see Peque, 22 NY3d at 193).
In addition, we recognize that our holding today will obligate New York courts, in the narrow context of cases involving CPL 340.40-mandated nonjury trials of lesser misdemeanors in New York City, to determine the potential immigration consequences associated with pending charges, and we are mindful of the People's concerns regarding the practicalities of litigating a defendant's immigration status.[FN9] In this regard, we emphasize that it is the defendant's burden to overcome the presumption that the crime charged is petty and establish a Sixth Amendment right to a jury trial (see Blanton, 489 US at 543; Nachtigal, 507 US at 3).[FN10] In the event the parties disagree as to the potential immigration consequences of a conviction, we are confident that our courts are competent to resolve such questions as they are presented. In this regard, "[t]here is no dearth of law on the subject," including "decisions of the Board of Immigration Appeals . . . , cases from other jurisdictions, and guidance provided by federal agencies charged with administration of admission and exclusion of persons to the United States" (Bado, 186 A3d at 1260-1261). Ultimately, "[e]ven if some judicial efficiency might be lost, in the weighing of harms and benefits on a constitutional scale, this remote possibility is not a determinative factor" (id. at 1262).
[*8]
{**32 NY3d at 508}As the Supreme Court has observed, "commonly accepted views of the severity of punishment by imprisonment may become so modified that a penalty once thought to be mild may come to be regarded as so harsh as to call for the jury trial" (Clawans, 300 US at 627). It is now beyond cavil that the penalty of deportation is among the most extreme and that it may, in some circumstances, rival incarceration in its loss of liberty (see Padilla, 559 US at 360; Peque, 22 NY3d at 192). Accordingly, we hold that a noncitizen defendant charged with a deportable crime is entitled to a jury trial under the Sixth Amendment, notwithstanding that the maximum authorized sentence is a term of imprisonment of six months or less.
V.
Here, defendant asserted that the crimes with which he was charged included deportable offenses and that, as a noncitizen, a resulting conviction would render him deportable. The People did not challenge either of these assertions.[FN11] Defendant is correct that at least one of the charges lodged against him—criminal obstruction of breathing or blood circulation (see Penal Law § 121.11)—qualified as a deportable offense. A "crime of domestic violence" includes "any crime of violence" against, as relevant here, "an individual with whom the person shares a child in common" (8 USC § 1227 [a] [2] [E] [i]). There is sufficient authority from which we may conclude that criminal obstruction of breathing or blood circulation is a crime of violence as it categorically "has as an element the use, attempted use, or threatened use of physical force against the person or property of another" (18 USC § 16 [a]; see Penal Law § 121.11; Johnson v United States, 559 US 133, 140 [2010]; Leocal v Ashcroft, 543 US 1, 11 [2004]). Further, federal case law indicates that conviction of this crime, under these circumstances, would render a noncitizen deportable (see 8 USC §§ 1227 [a] [2] [E] [i]; 1229b [b] [1] [C]; Hernandez-Zavala v Lynch, 806 F3d 259, 267 [4th Cir 2015]; Bianco v Holder, 624 F3d 265, 272 [5th Cir 2010]; Matter of Estrada, 26 Immigration & Naturalization Decision 749, 751 [Bd of Immigration Appeals 2016]). The record, therefore, establishes that defendant,{**32 NY3d at 509} a noncitizen, was charged with a crime carrying the penalty of deportation, rendering the offense a serious one, and the trial court's refusal to grant defendant's request for a jury trial violated his Sixth Amendment right. Accordingly, the order of the Appellate Division should be reversed and a new trial ordered.

Garcia, J. (dissenting). In my view, the possibility that conviction may lead to deportation does not transform an otherwise "petty" offense into a "serious" one for purposes of the right to a jury trial under the Sixth Amendment. Federal immigration law should not override the New York State Legislature's view of the seriousness of the charged offense, as expressed by the maximum penalty authorized. Accordingly, I respectfully dissent.
I.
As the majority makes clear, the "right to a jury trial does not extend to every criminal proceeding" (see majority op at 
495 [internal quotation marks omitted]). The Sixth Amendment distinguishes between "serious" and "petty" offenses (see Baldwin v New York, 399 US 66, 68 [1970] [noting a "line" exists "between 'petty' and 'serious' " offenses "for purposes of the Sixth Amendment right to jury trial"]). Those accused of a "serious" crime have a right to a jury trial under the Sixth Amendment; those accused of "petty" crimes do not (see id.). The Supreme Court has drawn a bright line for crimes with statutory maximums of more than six months in prison: such crimes are always "serious" for purposes of the Sixth Amendment (id. at 73-74). Crimes that do not clear the six-month imprisonment threshold are "presumptively petty" (United States v Nachtigal, 507 US 1, 3 [1993] [internal quotation marks omitted]).
That presumption can be overcome, however, in the "rare situation" when "additional statutory penalties" are "so severe that they clearly reflect a legislative determination that the offense in question is a 'serious' one" (Blanton v North Las Vegas 489 US 538, 543 [1989]). This penalty analysis is objective: it looks solely at "other penalties" which are "attache[d] to the offense" as a measure of "seriousness" (id. at 542). In other words, we assess whether a "particular legislature deemed a particular offense serious" (Nachtigal, 507 US at 4 [emphasis added and internal quotation marks omitted]).{**32 NY3d at 510}
II.
In my view, the analysis should focus on the penalties imposed by the New York State Legislature for the specific offense at issue. The majority justifies going beyond state borders by characterizing the Supreme Court's analysis as looking to government-imposed penalties, regardless of which sovereign imposes them (majority op at 
504). Although "nongovernmental" consequences are excluded by the Supreme Court's precedent, penalties resulting from "state action"—in this case, the risk of a future federal collateral consequence—must be considered (id. at 
505 n 5 [internal quotation marks omitted]). I disagree.
While it is true the Supreme Court has not considered federal collateral consequences in the context of the right to a jury trial (id. at 
504), the cases have consistently emphasized the role of the local legislature in determining the seriousness of the particular offense at issue. Under the Court's precedent, "[a]n offense carrying a maximum prison term of six months or less is presumed petty, unless the legislature has authorized additional statutory penalties so severe as to indicate that the legislature considered the offense serious" (Lewis v United States, 518 US 322, 326 [1996] [emphasis added]). The Supreme Court cases considering "additional penalties" contemplate only those imposed by the same sovereign that defined the crime. For example, in Blanton, the Court considered the consequences imposed by Nevada for driving under the influence of alcohol (489 US at 544 ["Considering the additional statutory penalties as well, we do not believe that the Nevada Legislature has clearly indicated that DUI is a 'serious' offense"]; see also Nachtigal, 507 US at 3). Indeed, as the majority itself states, it is "[t]he penalty authorized by the law of the locality" that is key to determining the judgment of that sovereign as to the seriousness of the crime (majority op at 
496, quoting Duncan v Louisiana, 391 US 145, 160 [1968]).
The majority acknowledges that not looking at how other states classify similar crimes is "eminently rational" (majority op at 
505). Congress is, however, different: "[t]he salient fact is that a legislative body authorized to attach a penalty to a state conviction has determined that the crime warrants the onerous penalty of deportation" (majority op at 
504). In addition to being at odds with basic principles of federalism (see infra section IV), it also strains credulity. Does every "violation of . . . any law . . . relating to a controlled substance" (8 USC § 1227 [a] [2] [B] [i])—deportable under federal immigration laws—in fact {**32 NY3d at 511}"stir[ ] community outrage" (majority op at 
504) and transform that violation into a serious crime? To import federal collateral consequences distorts the constitutional [*9]analysis beyond recognition: the reason we look to the penalty authorized by the local legislature is because that "legislature has included within the definition of the crime itself a judgment about the seriousness of the offense" (Frank v United States, 395 US 147, 149 [1969] [emphasis added]). Only that local legislature is capable of making the relevant judgment.
Recognizing this, most state courts have declined to consider federal consequences in the penalty analysis. As one state court put it, "the existence of a federal statute says nothing about how the [state] Legislature views the offense" (State v Race, 413 P3d 799 [Kan Ct App 2018] [table; text at 2018 WL 1247211, *3, 2018 Kan App Unpub LEXIS 167, *9 (2018)] [internal quotation marks omitted]). From this perspective, "restrictions on possession of a firearm and deportation . . . aris[ing] out of federal law" have been rejected as bases to elevate a state "petty" offense to a "serious" one (Amezcua v Eighth Jud. Dist. Ct. of State ex rel. County of Clark, 130 Nev 45, 50, 319 P3d 602, 605 [2014]; see also State ex rel. McDougall v Strohson [Cantrell], 190 Ariz 120, 125, 945 P2d 1251, 1256 [1997] ["(W)e do not consider the risk of deportation in determining whether the defendant is entitled to a jury trial on the state charge"]). This approach hews to the Supreme Court's instructions in Blanton, Nachtigal, and Lewis (cf. United States v Hernandez, 276 Fed Appx 291, 294 [4th Cir 2008] ["(T)he Supreme Court expressly instructs that laws passed by different legislatures are irrelevant to the question whether a particular legislature deemed a particular offense serious" (internal quotation marks omitted)]).
Relying on language about the severity of deportation from the Supreme Court's decision in Padilla v Kentucky (559 US 356 [2010]) and this Court's holding in People v Peque (22 NY3d 168 [2013]), the majority instead follows the lead of the D.C. Court of Appeals, holding that immigration consequences transform a state "petty" offense into a "serious" one (see Bado v United States, 186 A3d 1243 [DC 2018]). As set out below, this approach confuses different constitutional tests, which leads to some incongruous results.
III.
Padilla and Peque—both focusing on what information must be given to a defendant prior to entry of a knowing and intelligent{**32 NY3d at 512} plea—do not support a right to a jury trial for otherwise "petty" crimes. In Padilla, the Supreme Court determined that a lawyer fell below the "constitutionally reasonable professional assistance required under Strickland" when he or she failed to advise their client about immigration consequences of a potential plea (Padilla, 559 US at 365 [internal quotation marks omitted]; see also McMann v Richardson, 397 US 759, 766 [1970] [guilty plea "must be an intelligent act done with sufficient awareness of the relevant circumstances and likely consequences" (internal quotation marks omitted)]). Strickland v Washington, in turn, requires determining whether "counsel's assistance was reasonable considering all the circumstances" (466 US 668, 688 [1984] [emphasis added]). And so—after surveying "the practice and expectations of the legal community" (Padilla, 559 US at 366)—Padilla held it was "quintessentially the duty of counsel to provide her client with available advice about an issue like deportation" (id. at 371). The analysis focuses on whether the defendant received "essential advice specific to his or her personal circumstances" which "enables the defendant to make an intelligent choice between a plea and trial" (Peque, 22 NY3d at 190-191 [describing Padilla]; see also Richardson, 397 US at 766). Padilla was decided under a standard that required consideration of (1) a defendant's individual circumstances as well as (2) a broad survey of "practice and expectations of the legal community" (559 US at 366). In that context, the Court noted, "[w]e . . . have never applied a distinction between direct and collateral consequences to define the scope of constitutionally reasonable professional assistance required under Strickland" (Padilla, 559 US at 365 [internal quotation marks omitted]).
Peque's due process analysis similarly focused on information required by the specific defendant. In Peque, a majority of this Court held that "deportation constitutes such a substantial and unique consequence of a plea that it must be mentioned by the trial court to a defendant as a matter of fundamental fairness" (22 NY3d at 193). This is because "the court has an independent obligation to ascertain whether the defendant is pleading guilty voluntarily" (id.). The rule in Peque was made to ensure a "defendant understands the most fundamental and direct consequences of the plea" (id. at 191).
The penalty analysis with respect to a right to a jury trial is quite different. Rather than focus on the defendant's knowledge of the consequences of waiving a constitutional right, the{**32 NY3d at 513} determining factor is the legislature's view of the seriousness of the crime or how "the Legislature categorized the offense" (Lewis, 518 US at 327). In fact, the Supreme Court has explicitly rejected consideration of a defendant's circumstances as part of the [*10]penalty analysis: "an objective indicatio[n] of the seriousness with which society regards the offense . . . is used to determine whether a jury trial is required, not the particularities of an individual case" (id. at 328 [internal quotation marks omitted]). Accordingly, "[w]here we have a judgment by the legislature that an offense is 'petty,' we do not look to the prison term faced by a particular defendant who is charged with more than one such petty offense" (id.). The Supreme Court is unequivocal: the analysis focuses solely on whether a "particular legislature deemed a particular offense serious" (Nachtigal, 507 US at 4 [internal quotation marks omitted]).
Even before Blanton, this Court recognized the dangers of "a subjective standard" tied to individual defendants (Matter of Morgenthau v Erlbaum, 59 NY2d 143, 154 [1983]). Such a standard we said would create a "lack of predictability and consistency in determining when a jury trial would be granted" and completely divorce the right from the "offense charged" (id.). Nothing in Padilla or Peque requires changing this view—a view that has consistently been reaffirmed by the Supreme Court (see Blanton, 489 US at 545 n 11 ["The question is . . . whether (a state)" treats a crime as a " 'serious' offense"]; Nachtigal, 507 US at 3 ["The best indicator of society's views is the maximum penalty set by the legislature" (emphasis added)]; Lewis, 518 US at 326 ["(M)aximum penalty attached to the offense . . . is considered the most relevant . . . to assess the character of an offense, because it reveals the legislature's judgment about the offense's severity" (emphasis added)]).[FN1] Although the majority represents it is maintaining the "proper objective . . . focus" (majority op at 
507 n 8), the application of its test turns on the unique characteristics of the defendant, namely that defendant's immigration status.
Further proof of the inapplicability of the Padilla analysis to the penalty analysis lies in the remedy. In Padilla, recognizing{**32 NY3d at 514} the complexities of immigration law, and focused only on the defendant's understanding of the consequences of his actions, the Supreme Court stated that "[w]hen the law is not succinct and straightforward . . . a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences" (559 US at 369). Likewise, in Peque, we instructed trial courts to "mention" the possibility of deportation (22 NY3d at 194). As the majority makes clear, that approach does not suffice here. Rather, the court must determine what the exact consequences are to the defendant under federal immigration law. This may involve courts appointing their own "expert advisor[s] on immigration law" (Bado, 186 A3d at 1261) or having courts call federal immigration officials (majority op at 
507 n 9).[FN2] The fact that such measures are seriously proposed demonstrates how far afield the majority's rule has strayed from the Supreme Court's precedents.
The majority's subjective rule will likely prove unworkable. In the present case, although not raised before the trial court when it denied a jury trial, the defendant appears to be a visa overstay, making him deportable (see majority op at 
508 n 11). Is the enhanced "penalty" under the majority's rule the difference in the conditions that attach for removal after conviction?[FN3] Does the bar on application for reentry make a crime "serious" for a defendant who is otherwise deportable? These questions are largely left unanswered. Perhaps they are unanswerable. In any [*11]event, they need not be addressed under the Supreme Court's analysis that remains fixed on the state legislature's view of the seriousness of the crime charged.
Finally, using Padilla and Peque to expand the penalty framework to include potential consequences under federal immigration law is an approach that will have far-reaching effects. The majority finds this concern "overstated," while at the same time making clear that we leave for another day the determination as to which federal consequences are "sufficiently severe" to compel a jury trial for class B misdemeanors in New York City (majority op at 
506 n 7). Future courts will be left to{**32 NY3d at 515} explain how the loss of public housing because of a simple drug possession misdemeanor (see 42 USC § 1437d [l] [6]) does not transform that offense into a "serious" crime requiring trial by jury (see Matter of Santiago-Monteverde, 24 NY3d 283, 292 [2014] ["Affordable housing is an essential need"]). Now that the door has been opened, "singl[ing] . . . out" deportation "for special treatment" will be hard to explain "when . . . so many civil laws today impose so many similarly severe sanctions" (Sessions v Dimaya, 584 US —, —, 138 S Ct 1204, 1231 [2018, Gorsuch, J., concurring in judgment]).
IV.
Allowing federal immigration law to override the intention of New York Legislature raises several other troubling issues. The "petty" offense exception is deeply rooted in our legal tradition. "[F]or centuries past . . . justices of the peace" have been allowed to try "minor and statutory police offenses"—what we now commonly refer to as "minor or petty offenses" (Callan v Wilson, 127 US 540, 552 [1888]). "[D]ividing behavior into serious affairs and minor misdeeds" required (and still requires) an "exercise of moral judgment" (Felix Frankfurter & Thomas G. Corcoran, Petty Federal Offenses and the Constitutional Guaranty of Trial by Jury, 39 Harv L Rev 917, 980 [1926]). As Justice Frankfurter explained, these moral judgments were traditionally made by the "community" with an eye towards factors including "the wide repetition of the act" which "rais[ed] practical problems of enforcement" (id.).
The Supreme Court has grounded the modern "petty" offense exception in such concerns. Flowing from historical practice, the exception preserves "benefits to efficient law enforcement and simplified judicial administration resulting from the availability of speedy and inexpensive nonjury adjudications" (Duncan, 391 US at 160). In other words, the "petty" offense exception to the Sixth Amendment gives states room below the six-month constitutional line to appropriately weigh the "benefits that result from speedy and inexpensive nonjury adjudications" (Blanton, 489 US at 543 [internal quotation marks omitted]; see also Jeff E. Butler, Petty Offenses, Serious Consequences: Multiple Petty Offenses and the Sixth Amendment Right to Jury Trial, 94 Mich L Rev 872, 875 [1995] ["(P)etty-offense exception . . . follows directly from the need for efficient allocation of the right to jury trial"]). In fact, as a result of the Supreme Court's adoption of the bright-line six-month{**32 NY3d at 516} imprisonment test, a number of states lowered the penalty imposed for certain misdemeanor offenses in order to ensure they remained "petty" for purposes of the right to a jury trial (see Baldwin, 399 US at 71; see also 6 Wayne R. LaFave, Jerold H. Israel, Nancy J. King & Orin S. Kerr, Criminal Procedure § 22.1 [b] [4th ed] [Blanton standard meant to provide state legislatures "an easy way to avoid jury trials for less serious offenses . . . in part to spare the costs associated with jury trials"]).
New York has made a similar calculation. As we have recognized, the standard set in CPL 340.40 is tied directly to the concerns the "petty" offense exception is designed to address: "[e]specially in New York City, with its high volume of misdemeanor cases, [CPL 340.40] furthers the important public interest of effective judicial administration" (People v Urbaez, 10 NY3d 773, 775 [2008]; see also People v Moses, 57 Misc 2d 960, 968-969 [Crim Ct, NY County 1968] ["To be a Judge in the New York City Criminal Court is . . . a challenge of the highest degree. This court is the most overworked and understaffed court of any community"]). Our system of government entrusts the "powers which 'in the ordinary course of affairs, concern the lives, liberties, and properties of the people' " to "governments more local and more accountable than a distant federal bureaucracy" (National Federation of Independent Business v Sebelius, 567 US 519, 536 [2012], quoting Madison, Federalist No. 45). The administration of justice in New York, within the bounds allowed by the Sixth Amendment, should be left to a "government[ ] more local"—and not ceded to the possibility of action by a "distant federal bureaucracy" enforcing federal immigration laws (id.).
The majority is forthright in its view that Congress' "legislative determination 
. . . is dispositive to the analysis here" (majority op at 504). Put another way, the majority has explicitly designated Congress as the relevant authority for purposes of determining when a jury trial is warranted for a New York crime. Yet "the Constitution has never [*12]been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions" (New York v United States, 505 US 144, 162 [1992]) or to permit Congress to "commandee[r] the legislative processes of the State[ ]" (Murphy v National Collegiate Athletic Assn., 584 US —, —, 138 S Ct 1461, 1477 [2018] [internal quotation marks omitted and first modification in original]). This is especially so when it comes to{**32 NY3d at 517} a State's criminal laws: "[i]n our federal system, States possess primary authority for defining and enforcing criminal laws, including those prohibiting the gravest crimes" (Luna Torres v Lynch, 578 US —, — n 9, 136 S Ct 1619, 1628 n 9 [2016] [internal quotation marks omitted and emphasis added]).
Today's decision, unfortunately, violates this basic constitutional directive. No action by the state legislature can change the effects of federal immigration law. No reduction in penalties imposed by the State can counteract that federal "determination." Moreover, any change wrought by Congress in the immigration law will directly affect a defendant's right to a jury trial in New York. Adding to, or deleting from, the list of deportable offenses will now be tantamount to a decision by Congress on the "seriousness" of that crime for Sixth Amendment purposes.
V.
There is now a split in terms of how the Sixth Amendment right to jury should be understood (see supra at 
510-511), opening the door to further litigation, in both state and federal courts, over exactly which collateral consequences may make an otherwise "petty" offense "serious." It is doubtful that importing federal immigration law into the penalty analysis was something the Supreme Court intended when it made the Sixth Amendment right to trial by jury for "serious" offenses applicable to the states. In the end, the Supreme Court has the ultimate authority to settle this issue. For the reasons set forth above, it should do so.
I respectfully dissent.

Wilson, J. (dissenting). The majority's opinion proceeds on the following seven steps: (1) the Sixth Amendment to the United States Constitution guarantees a jury trial for all offenses that are "serious" rather than "petty"; (2) "seriousness" is measured by the severity of the penalty associated with the offense; (3) the penalty to be considered is not limited to the term of incarceration, but encompasses other governmentally-imposed consequences; (4) deportation is such a penalty; (5) deportation is severe; (6) even though deportation is technically civil, it is difficult to classify as civil or criminal; and (7) even though the penalty of deportation is imposed by the federal government, not the state government under whose laws the defendant is being prosecuted, it is nevertheless equally cognizable.{**32 NY3d at 518}
[*13]That construct ignores or obscures one insuperable problem: the penalty for violation of United States immigration laws includes deportation, and deportation proceedings have never been deemed to entitle a noncitizen to anything more than an administrative hearing—certainly not a jury trial. Thus, under the majority's decision, an undocumented alien may be deported by an administrative proceeding in front of an immigration judge, who is an employee of the Department of Justice, but if that same undocumented alien commits an act of domestic violence, the prospect that an immigration judge will subsequently deport him entitles him to a jury trial. Put differently, if the severity of deportation entitles one to a jury trial under the Sixth Amendment, the entire federal system of removal of undocumented aliens is unconstitutional. If so, more than a century of United States Supreme Court decisions must be discarded. A certain Court can so hold, just not this one.
In Fong Yue Ting v United States, the Court concluded: "the provisions of the Constitution, securing the right of trial by jury, and prohibiting unreasonable searches and seizures, and cruel and unusual punishments, have no application" to proceedings to exclude or expel noncitizens (149 US 698, 730 [1893]). That proposition has been consistently reaffirmed by the United States Supreme Court in numerous decisions (see e.g. Bugajewitz v Adams, 228 US 585, 591 [1913] ["It is thoroughly established that Congress has power to order the deportation of aliens whose presence in the country it deems hurtful. The determination by facts that might constitute a crime under local law is not a conviction of crime, nor is the deportation a punishment; it is simply a refusal by the Government to harbor persons whom it does not want. The coincidence of the local penal law with the policy of Congress is an accident"]; Bridges v Wixon, 326 US 135, 153 [1945] ["The person to whom the power to deport has been entrusted is the Attorney General or such agency as he designates. 8 U. S. C. § 155. He is an original trier of fact on the whole record. It is his decision to deport an alien that Congress has made 'final' "]; INS v Lopez-Mendoza, 468 US 1032, 1038-1039 [1984] ["A deportation proceeding is a purely civil action to determine eligibility to remain in this country, not to punish an unlawful entry, though entering or remaining unlawfully in this country is itself a crime. 8 U. S. C. §§ 1302, 1306, 1325 . . . See 8 U. S. C. §§ 1251, 1252(b); Bugajewitz v. Adams, 228 U. S. 585, 591 (1913); 
Fong Yue Ting v. United States, 149 U. S. 698, 730{**32 NY3d at 519}(1893) . . . The purpose of deportation is not to punish past transgressions but rather to put an end to a continuing violation of the immigration laws"]; Nijhawan v Holder, 557 US 29, 42 [2009] ["a deportation proceeding is a civil proceeding in which the Government does not have to prove its claim 'beyond a reasonable doubt' "]).
I do not dispute that deportation is extraordinarily severe, particularly for persons who have built a life in this country. Some have families here, some came here themselves as children, and know nowhere else. Indeed, dissenters in the controlling Supreme Court cases have sometimes noted that severity as a reason to question the prevailing doctrine,[FN1] and commentators have suggested that Padilla may be a sign that the Supreme Court will [*14]abandon or substantially modify that doctrine.[FN2] But if the severity of deportation itself is sufficient to trigger the Sixth Amendment's right to a jury trial, I see no principled distinction to allow deportation proceedings themselves to occur outside of article III courts with the full panoply of constitutional rights attendant thereto. That is not the state of federal law today; it has been to the contrary for well over a century. We are bound to follow the United States Supreme Court's interpretation of the Sixth Amendment, which holds that despite its severity, deportation does not activate the Sixth Amendment's right to a jury trial.{**32 NY3d at 520}
One further item bears mention. The problem created by this case arises from the peculiar statute governing the right to a jury trial in B misdemeanors, found in CPL 340.40 (2). All persons in New York State are entitled to a jury trial if charged with a B misdemeanor, unless they reside in New York City, in which case they have no such right. Were the legislature to extend that right to all New Yorkers, the problems underlying this issue would vanish.
Accordingly, I dissent.
Chief Judge DiFiore and Judges Rivera, Fahey and Feinman concur; Judge Garcia dissents and votes to affirm in an opinion; Judge Wilson dissents in a separate dissenting opinion.
Order reversed and a new trial ordered.

Footnotes

Footnote 1:There is no claim raised here that this statutory distinction violates the New York Constitution, which guarantees that "[t]rial by jury in all cases in which it has heretofore been guaranteed by constitutional provision shall remain inviolate forever" (NY Const, art I, § 2), but otherwise permits the legislature to "authorize any court which shall have jurisdiction over crimes and other violations of law, other than crimes prosecuted by indictment, to try such matters without a jury" (NY Const, art VI, § 18 [a]). Nor does defendant raise any challenge to CPL 340.40 based on its differential treatment of defendants depending upon the location of their prosecution.

Footnote 2:That discretion is codified in 8 USC § 1229b, which provides that "[t]he Attorney General may cancel removal of, and adjust to the status of an alien lawfully admitted for permanent residence, an alien who is inadmissible or deportable from the United States if the alien" has been in the country continuously for at least 10 years, is of good moral character, has not been convicted of certain crimes—including those crimes which render an alien deportable under 8 USC § 1227 (a) (2)—and, the alien establishes that removal would result in "exceptional and extremely unusual hardship" to the alien's immediate family lawfully residing in the country (8 USC § 1229b [b] [1]).

Footnote 3:To reiterate what we have explained in the context of pleas, direct consequences of a conviction are those that have "definite, immediate[,] and largely automatic effect on [the] defendant's punishment" (People v Peque, 22 NY3d 168, 184-185 [2013]), such as " 'the core components of a defendant's sentence: a term of probation or imprisonment, a term of postrelease supervision, [or] a fine' " (People v Monk, 21 NY3d 27, 32 [2013], quoting People v Harnett, 16 NY3d 200, 205 [2011]). Collateral consequences, by contrast, are " 'peculiar to the individual and generally result from the actions taken by agencies the court does not control' " (Monk, 21 NY3d at 32, quoting People v Ford, 86 NY2d 397, 403 [1995]). Examples include the "loss of the right to vote or travel abroad, loss of civil service employment, loss of a driver's license, loss of the right to possess firearms[,] . . . the imposition of a prison term upon revocation of postrelease supervision, [and] sex offender registration" (Peque, 22 NY3d at 185 [internal quotation marks and citations omitted]).

Footnote 4:We are unconvinced that the civil nature of deportation proceedings compels us to exclude it from the Sixth Amendment analysis—in a criminal prosecution—of penalties imposed upon conviction, particularly in light of the recognition by both this Court and the Supreme Court that the penalty of deportation is inextricably intertwined with the criminal justice process and that, in many instances, it necessarily flows from a criminal conviction. The Sixth Amendment jury trial right attaches where the charges will potentially result in a criminal conviction that carries statutory penalties warranting jury trial protection; this is not altered by the fact that deportation itself will be effectuated through a subsequent administrative proceeding. Nor does it follow from our analysis that the Sixth Amendment right to a jury trial for criminal prosecutions must be extended to civil immigration proceedings (see e.g. Padilla v Kentucky, 559 US 356, 369 [2010] [holding that Sixth Amendment protections for criminal prosecutions require a criminal defendant to be advised of the civil consequence of deportation]).

Footnote 5:Similarly, the Supreme Court's caution in Blanton that "only penalties resulting from state action, e.g., those mandated by statute or regulation, should be considered" for Sixth Amendment jury trial purposes does not signify that federal consequences must be excluded from the analysis (489 US at 543 n 8). Rather, the Court was merely clarifying that only governmental actions should be considered. Stated differently, the term "state action" was used to differentiate between the consequences of a conviction that flow from governmental action, as opposed to those that ensue as a result of nongovernmental action, such as increases in insurance costs associated with a drunk driving conviction or social stigma that may be leveled against a defendant based on the nature of an offense (id., citing Douglas E. Lahammer, Note, The Federal Constitutional Right to Trial by Jury for the Offense of Driving While Intoxicated, 73 Minn L Rev 122, 149-150 [1988]).

Footnote 6:We note that nothing in the language of the CPL or its history evinces a New York legislative determination that deportation is not a serious penalty. Indeed, this is unsurprising since deportation is a penalty that the New York State Legislature has no authority to impose as part of a state conviction.

Footnote 7:A federally-imposed penalty will preclude the state legislature from denying a defendant the right to a jury trial only where the penalty in question invariably flows from a state conviction. A state need not award a defendant a jury trial where the resulting penalties warrant treating the crime as a petty offense, even if the federal government imposes a more severe penalty for an analogous crime in federal prosecutions, which penalty will not be imposed on state defendants. Further, as previously noted, this Court, itself, already has recognized that deportation is inextricably intertwined with the state criminal justice process, and that it is a unique and extraordinarily severe penalty of a state criminal conviction (see Peque, 22 NY3d at 191-192). Thus, only those federal consequences of a state conviction that are determined to be sufficiently severe will compel a state to extend the right to a jury trial. To be sure, state legislatures may define their own criminal laws (see Garcia, J., dissenting op at 
516-517), and we look most often to the penalties imposed by such legislatures when conducting a right to a jury trial analysis because those are the penalties most immediately inflicted upon a convicted defendant. However, this does not mean that state legislatures define the scope of the Sixth Amendment right to a jury trial to the exclusion of penalties imposed upon state defendants by the federal government. We have no occasion today to identify or pass on which consequences may or may not so qualify; it suffices to say that our dissenting colleague's concern that our holding today will have "far-reaching" consequences beyond the deportation context is overstated (see Garcia, J., dissenting op at 
514).

Footnote 8:Contrary to our dissenting colleague's suggestion (see Garcia, J., dissenting op at 
512-513) consideration of deportation as a penalty for Sixth Amendment purposes maintains the proper objective—rather than subjective—focus on the relevant legislatures' views of the particular offense as being either petty or serious based on the maximum authorized penalty for that particular offense. In that respect, inclusion of deportation in the right to a jury trial analysis is plainly distinguishable from consideration of the aggregate prison term facing a defendant who is charged with multiple petty offenses, as "[t]he fact that [a defendant] was charged with [more than one] count[ ] of a petty offense does not revise the legislative judgment as to the gravity of that particular offense" (Lewis v United States, 518 US 322, 327 [1996]).

Footnote 9:We note that federal immigration authorities are statutorily obligated to respond to requests by state officials to verify or ascertain an individual's citizenship or immigration status (see 8 USC § 1373 [c]; Arizona v United States, 567 US 387, 412 [2012]).

Footnote 10:Although defense attorneys may caution clients against revealing their immigration status in court, it is a defendant's choice whether to do so in support of an application for a jury trial.

Footnote 11:The People claim that it was subsequently discovered that defendant was deportable, notwithstanding his conviction, due to his unlawful entry into the country. However, the trial court was unaware of this when it denied defendant's motion for a jury trial, and it was not a basis of that court's decision (see People v LaFontaine, 92 NY2d 470, 473 [1998]).

Footnote 1:The majority justifies its departure, in part, by "not[ing] that nothing in the language of the CPL or its history evinces a New York legislative determination that deportation is not a serious penalty" (majority op at 
506 n 6 [emphasis omitted]). But, in Erlbaum, we said that "the Legislature must be presumed to have weighed public opinion and history, and to have been aware of the civil implications of conviction" (59 NY2d at 154).

Footnote 2:As the majority makes clear, if you call Immigration and Customs Enforcement, they will certainly respond.

Footnote 3:The Bado court noted the "harsher substantive and procedural requirements" that apply when deportation is based upon criminal conviction versus " 'regulatory' deportations, such as when a person is out of status" (186 A3d at 1254 and n 22).

Footnote 1:See e.g. Fong Yue Ting, 149 US at 740 (Brewer J. dissenting) ("Every one knows that to be forcibly taken away from home, and family, and friends, and business, and property, and sent across the ocean to a distant land, is punishment, and that oftentimes most severe and cruel"); Jordan v De George, 341 US 223, 243 (1951, Jackson J., dissenting) ("Deportation proceedings technically are not criminal; but practically they are for they extend the criminal process of sentencing to include on the same convictions an additional punishment of deportation. If respondent were a citizen, his aggregate sentences of three years and a day would have been served long since and his punishment ended. But because of his alienage, he is about to begin a life sentence of exile from what has become home, of separation from his established means of livelihood for himself and his family of American citizens. This is a savage penalty and we believe due process of law requires standards for imposing it as definite and certain as those for conviction of crime"); see also Galvan v Press, 347 US 522, 531 (1954, Frankfurter, J.) (writing, in dicta, "since the intrinsic consequences of deportation are so close to punishment for crime, it might fairly be said also that the ex post facto Clause, even though applicable only to punitive legislation, should be applied to deportation").

Footnote 2:See e.g. Anita Ortiz Maddali, Padilla v. Kentucky: A New Chapter in Supreme Court Jurisprudence on Whether Deportation Constitutes Punishment for Lawful Permanent Residents?, 61 Am U L Rev 1 (Oct. 2011); Peter L. Markowitz, Deportation Is Different, 13 U Pa J Const L 1299 (June 2011).