No. 123,309

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

CITY OF WICHITA,
*Appellee*,

v.

GELI GRASTY,
*Appellant*.

SYLLABUS BY THE COURT

1.

The seven-day clock to request a jury trial in municipal court appeals begins when a judge is appointed to preside over the case at trial.

2.

If an offense carries a maximum penalty of six months in jail or less, it is presumed that the defendant has no constitutional right to a jury trial.

Appeal from Sedgwick District Court; SETH L. RUNDLE, judge. Opinion filed October 22, 2021. Affirmed.

*Kevin J. Zolotor* and *Christopher S. O'Hara*, of O'Hara & O'Hara LLC, of Wichita, for appellant.

*Jan Jarman*, assistant city attorney, and *Jennifer Magana*, city attorney, for appellee.

Before ARNOLD-BURGER, C.J., SCHROEDER, J., and WALKER, S.J.

ARNOLD-BURGER, C.J.: Police arrested Geli Grasty for offering to sell sexual services during a massage. A municipal judge convicted Grasty, and she appealed to the

district court. Once she filed her appeal, the case was assigned to the district judge who would preside over her trial. Grasty had seven days to file a request for a jury trial from the date of the assignment. Her request for a jury trial was filed well outside the seven-day limit. The district court denied her request for a jury trial and Grasty was ultimately convicted by the judge at a bench trial. She timely appeals her conviction, arguing that the district court erred by denying her request for a jury trial and by finding her guilty. Finding no error, we affirm.

FACTUAL AND PROCEDURAL HISTORY

Steven Molde, a detective for the Wichita Police Department, went to Amazing Massage, a massage parlor in Wichita, Kansas, as part of an investigation into illegal sexual activity. Equipped with a wireless microphone that the other detectives listened to in real time, Molde posed as a customer.

Molde arrived at the business, rang the doorbell, and waited until Grasty opened the door. Grasty asked Molde if he wanted a massage, and he said he wanted a 30-minute massage. Grasty informed Molde that a 30-minute massage would cost $40, which he paid. Grasty left the room and Molde took his clothes off and put a towel around his midsection. Molde then laid face-down on the massage table and Grasty returned to the room. Grasty began to massage Molde's back and arms and eventually removed Molde's towel. After removing the towel, Grasty massaged Molde's buttocks and placed "her hand between [his] buttocks." During the massage, Molde engaged in some small talk with Grasty. Molde thought Grasty understood what he was saying for the most part.

After the 30-minute massage was over, Molde stood up and Grasty asked if there was anything else he wanted. Grasty "held her hand up like five and one" and Molde asked if she meant $60. Then he asked what he could get for $60 and "in a slang term

2

[Molde] asked for a hand job and gestured with [his] right hand." After making the hand gesture, Molde testified that Grasty said, "Yes."

Molde then went to get money out of his jeans and came back to Grasty. Grasty then said, "No. No massage," but then put her hand up again to convey $60. At some point, Grasty put her finger up and Molde interpreted this as her wanting to be quiet about what was happening. Molde gave Grasty the $60. Grasty then told Molde to go lay back down on the table. Molde gave the verbal arrest code and told Grasty that he did not want to go through with it anymore.

The other detectives entered the building and Molde provided Grasty her *Miranda* warnings, in English and Mandarin. Grasty agreed to speak with Molde. After questioning her, Molde issued Grasty a notice to appear.

As a result of what occurred, the City of Wichita charged Grasty with selling sexual relations in violation of Wichita Municipal Code § 5.68.010(1)(c). She pled no contest, and the court granted Grasty probation and imposed $451.50 in fines and fees.

Grasty filed a timely appeal from the municipal court to the district court on June 21, 2019. On the same day, the case was set for "Bench CAD" on July 3, 2019, in Division 5. The word "Bench" is handwritten in a blank space followed by the word "trial." "CAD" is handwritten directly over "trial." The Register of Actions lists the July 3, 2019 date as "Criminal Bench Trial – Control Only." The district court continued the hearing to July 31, 2019, and later continued it again to August 14, 2019.

On August 14, 2019, Grasty requested a jury trial. On August 26, 2019, the district court approved Grasty's request for a jury trial and set the trial date for January 6, 2020. On September 24, 2019, the district court emailed the parties and stated that Grasty's

3

request for a jury trial might have been untimely and requested the parties' input on the issue.

The City moved to deny the motion for jury trial. The City argued that Grasty's August 14, 2019 request for a jury trial was outside the seven-day time limit to request a jury trial because the case was assigned "to Judge Rundle for a CAD docket on July 3, 2019" and "had bench trial control dates of July 31, 2019 and August 14, 2019." In her response, Grasty argued a setting on the "CAD" docket, which seems to mean "'Criminal Assessment Docket'" or "'Criminal Assignment Docket,'" does not start the running of the seven-day time limit.

The district court granted the City's motion finding that the seven-day clock started on June 21, 2019, which is when Grasty appealed the municipal conviction, and the case was assigned to the district judge.

At the subsequent bench trial the State's evidence was as presented above. Grasty also testified, through an interpreter, at the trial. According to Grasty, her fee for a 30-minute massage was $40, a 60-minute massage was $60, and a 90-minute massage was $100. Grasty testified that she did not know what the hand gesture that Molde made after the massage meant. Grasty testified that at the end of the 30-minute massage, Molde said that she did a good job, so she offered to extend the massage for an additional period of time. Grasty said that she did not receive an additional $60 from Molde. Grasty said that she did not talk about any sexual services with Molde. When asked why she was whispering, Grasty explained that it was because Molde started to whisper.

The district court found Grasty guilty and imposed a $200 fine, court costs, and 12 months' probation. Grasty timely appealed.

4

On appeal, Grasty raises two issues. First, she argues that the district court erred when it denied her request for a jury trial. We will address her argument in two sections, one addressing the statutory time limitation, and the other addressing whether Grasty had a constitutional right to a jury trial. Second, she argues there was insufficient evidence to support her conviction.

*The District Court Did Not Err by Denying Grasty's Request for a Jury Trial.*

*Our standard of review is unlimited.*

To answer this question, we must interpret the meaning of K.S.A. 2020 Supp. 22-3609(d). Statutory interpretation presents a question of law over which appellate courts have unlimited review. *State v. Alvarez*, 309 Kan. 203, 205, 432 P.3d 1015 (2019). The most fundamental rule of statutory construction is that the intent of the Legislature governs if that intent can be determined. *State v. LaPointe*, 309 Kan. 299, 314, 434 P.3d 850 (2019).

*"First notice of trial assignment" means the date a case is assigned to a particular judge for trial.*

Under Kansas law, "[t]he trial of misdemeanor cases shall be to the court unless a jury trial is requested in writing by the defendant not later than seven days after first notice of trial assignment is given to the defendant or such defendant's counsel." K.S.A. 22-3404(1). In an essentially identical statute, Kansas law further provides that "the trial of municipal appeal cases shall be to the court unless a jury trial is requested in writing by the defendant not later than seven days after first notice of trial assignment is given to the defendant or such defendant's counsel." K.S.A. 2020 Supp. 22-3609(d). The question

here is what is meant by "first notice of trial assignment." K.S.A. 22-3404(1); K.S.A. 2020 Supp. 22-3609(d).

This court has answered that question in the past by holding that "[t]he term 'trial assignment' under K.S.A. 1993 Supp. 22-3404(1) refers to the date of the assignment of the case to a particular judge or court, not the trial setting." *State v. Bell*, 20 Kan. App. 2d 193, Syl. ¶ 2, 884 P.2d 1164 (1994) (*Bell I*), *aff'd in part, rev'd in part* 258 Kan. 123, 899 P.2d 1000 (1995).

In *Bell I*, the district court arraigned the defendant in December 1993 and entered a plea of not guilty. Two months later his case was transferred to a division of the district court for trial. Seventeen days later the case was set for bench trial. On that same day, the defendant filed a written request for a jury trial. The district court denied the request, finding the request was not timely because the clock started running in February when the court notified the defendant of the transfer of the case to the division. The district court judge found the defendant guilty following a bench trial and the defendant timely appealed his conviction.

On appeal, the defendant argued that the statutory clock should have started when his case was actually set for trial. This court disagreed. Instead, this court determined that "the term 'trial assignment,' as used in [K.S.A.] 22-3404(1), means to appoint a judge to the duty of presiding over a case at trial." 20 Kan. App. 2d at 197.

When reaching its decision, the court considered the defendant's three possible interpretations of "trial assignment"—"'first appearance before a judge,' 'first notice of case assignment to a division of the district court,' or 'first notice of trial setting.'" 20 Kan. App. 2d at 198. The court reasoned that only the second interpretation aligned with the language used in K.S.A. 22-3404(1). The other two, first appearance or trial setting, have

6

particular meanings within the law and should be construed according to that particular meaning. 20 Kan. App. 2d at 198.

For example, "trial setting" appears other places within Kansas statutes and, as this court reasoned, "refers to scheduling a date and time for a trial and cannot be interpreted to mean the same thing as 'trial assignment.'" 20 Kan. App. 2d at 199; see also K.S.A. 2020 Supp. 61-3101(d) ("the party who obtained the admissions shall be allowed a continuance of the *trial setting*" [emphasis added]); K.S.A. 2020 Supp. 8-1604(c) ("Any charge hereunder shall be dismissed if no request for a *trial setting* has been made within 60 days of the date evidence of financial security was produced in court." [Emphasis added.]); K.SA. 2020 Supp. 40-3104(e) ("Any charge of violating subsection (b), (c) or (d) shall be dismissed if no request for a *trial setting* has been made within 60 days of the date evidence of financial security was produced in court." [Emphasis added.]).

Likewise, the term "'first appearance'" refers to a court proceeding where the court advises a defendant of the charges and informs them of their rights, addresses bail, and, in felony cases, schedules a preliminary hearing. 20 Kan. App. 2d at 199. This court reasoned that if the "legislature had intended that a jury request be made within seven days of the first appearance whether or not the judge at the first appearance would be the trial judge, it would have presumably used that language." 20 Kan. App. 2d at 199; see also K.S.A. 2020 Supp. 22-2901(7) ("[S]uch person shall not be allowed to post bond pending such person's *first appearance* in court provided that a first appearance occurs within 48 hours after arrest." [Emphasis added.]); K.S.A. 2020 Supp. 22-2802(1) ("Any person charged with a crime shall, at the person's *first appearance* before a magistrate, be ordered . . . ." [Emphasis added.]); K.S.A. 2020 Supp. 12-4517(a)(2) ("The municipal court judge shall ensure that all persons arrested or charged with a violation of a city ordinance prohibiting the acts prohibited by [the listed statutes] are fingerprinted and processed at the time of booking or *first appearance*, whichever occurs first." [Emphasis

7

added.]); K.S.A. 2020 Supp. 38-2344(e) ("*First appearance* may be conducted by two-way electronic audio-video communication . . . ."[Emphasis added.]).

The court also looked to the legislative history of K.S.A. 22-3404 to reach its decision. Before 1989, all misdemeanor trials were bench trials unless the defendant requested a jury trial in writing no later than 48 hours before the trial. 20 Kan. App. 2d at 200. At the time, the procedure allowed defendants to set a case for trial, only to request a jury trial just a couple of days before the trial setting, leading to considerable delays. Defendants used a similar procedure for municipal appeals.

The Legislature amended both statutes in the same way—inserting today's "trial assignment" language and, according to the committee minutes, the amendment "'would allow adequate preparation of cases and also reduce the number of continuances due to delayed requests for jury trials.'" 20 Kan. App. 2d at 200-01 (quoting Minutes of the Subcommittee on Criminal Law of the Senate Judiciary Committee, March 3, 1992).

As this court saw it in *Bell I*, if a *trial setting* is requested before the seven-day clock starts, the purpose of the amendment is frustrated because the court would have to reschedule the case for jury trial. 20 Kan. App. 2d at 201. Thus, the court held that the seven-day clock starts running on the date the case is assigned to a particular judge or court. 20 Kan. App. 2d 193, Syl. ¶ 2.

On appeal, Grasty argues that the holding in *Bell I* should be more nuanced because a blanket rule could lead to unintended consequences in some cases. For example, Grasty points to smaller communities where one judge handles all criminal cases. Grasty speculates that under the rule in *Bell I*, the seven-day clock would start running at the receipt of a summons or any notice of hearing, even if the first appearance is at a much later date. But this example seems to be a nonissue under the statute. Even in a community where only one judge handles all criminal cases, after a summons or notice

8

of hearing is issued the case must be officially assigned to said judge, even if the assignment is a foregone conclusion.

Grasty also argues that because different jurisdictions have different local rules there can be no bright-line rule for when the clock to request a jury trial for city appeals starts running. But that is not the case:  there is a bright-line rule in K.S.A. 22-3404(1) and K.S.A. 2020 Supp. 22-3609(d), along with this court's interpretation of those statutes. It is up to the individual districts to ensure that their local rules comply with the rule set out in the statutes. If that means that some cases are assigned for trial at a first appearance, then the seven-day clock starts running at the first appearance. If there is some holding period after the first appearance when a defendant does not know which judge will preside over the case at trial, then the seven-day clock does not start until the case is assigned to the judge who will preside over the trial.

In *Bell I*, this court thoroughly examined the language in K.S.A. 22-3404(1) and K.S.A. 1993 Supp. 22-3609(4). We find its reasoning persuasive. Grasty has not presented compelling arguments to convince us that the decision in *Bell I* was incorrect. We agree with the rule expressed in *Bell I*, 20 Kan. App. 2d at 197, that the seven-day clock to request a jury trial in misdemeanor cases and municipal appeals begins when a judge is appointed to the duty of presiding over the case at trial. Our decision today is also bolstered by the long recognized rule that when the Legislature fails to modify a statute to avoid a standing judicial construction of that statute, we presume the Legislature agrees with the court's interpretation. See *State v. Hambright*, 310 Kan. 408, 419, 447 P.3d 972 (2019); *State v. Rollins*, 264 Kan. 466, 474, 957 P.2d 438 (1998).

On the day Grasty's municipal appeal was filed it was assigned to the judge who would handle her case through to its conclusion. Under *Bell I*, the seven-day clock to request a jury trial started as soon as the case was assigned to the district judge who would handle the case. 20 Kan. App. 2d at 197. If a defense attorney thinks that their

client is best served by a requesting a jury trial in a misdemeanor case or municipal appeal, they must do so quickly. Whether this reiteration of the rule will lead to a rush of defense attorneys in Wichita requesting jury trials and causing the system to grind to a slow crawl, only to withdraw their requests on the eve of trial is yet to be seen. But this has been the rule since the Kansas Legislature amended the statutes and this court interpreted them in 1994. See 20 Kan. App. 2d at 197. If this 25-year-old rule leads to unanticipated collateral consequences, it is for the Legislature to address, not this court.

*The trial judge did not abuse his discretion by denying Grasty's jury trial request even if it was untimely.*

Under K.S.A. 22-3609(d), even if a defendant files a request for a jury trial out of time, that request "may be waived in the discretion of the court upon a finding that imposing such time requirement would cause undue hardship or prejudice to the defendant." Grasty argues that under the circumstances the district court abused its discretion in denying her request for a jury trial.

A judicial action constitutes an abuse of discretion if (1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact. *State v. Ingham*, 308 Kan. 1466, 1469, 430 P.3d 931 (2018)

Grasty's sole argument is that the district court's denial of her request "constituted 'undue' prejudice" because there was "no meaningful reason to impose the deadline in this case." Yet she fails to argue what specific prejudice or undue hardship she experienced because of the court's decision. See *State v. Salary*, 309 Kan. 479, 481, 437 P.3d 953 (2019) (issues not adequately briefed are considered waived or abandoned; failure to support a point with pertinent authority or show why it is sound despite a lack of supporting authority or in the face of contrary authority is akin to failing to brief the issue). For these reasons, Grasty fails to persuade us that the district court abused its

discretion by denying her motion for a jury trial. She has not shown that *she* faced any specific undue hardship or prejudice as a result.

As it stands, Grasty's request for a jury trial was untimely and the district court did not abuse its discretion by choosing to enforce the statutory time limitation. But that does not conclude the issue. Grasty next argues that she had a constitutional right to a jury trial.

*Grasty Did Not Have a Constitutional Right to a Jury Trial.*

Grasty argues that the district court erred by not finding that she had a constitutional right to a jury trial in this case.

   *Our standard of review is de novo.*

In determining whether Grasty's arguments require this court to determine whether she had a constitutional right to a jury trial, we exercise de novo review. See *State v. Coleman*, 312 Kan. 114, 117, 472 P.3d 85 (2020).

   *Upon conviction, Grasty faced six months in jail or less, so she had no*
   *constitutional right to a jury trial.*

Whether Grasty has a constitutional right to a jury trial hinges on whether her offense is categorized as a serious or petty offense. If it is a serious offense, then she is entitled to a jury trial under the Sixth Amendment to the United States Constitution and section 10 of the Kansas Constitution Bill of Rights. But if it is a petty offense, she has no constitutionally based right to a jury trial. See *State v. Woolverton*, 52 Kan. App. 2d 700, 371 P.3d 941 (2016).

"The terms 'serious offense' and 'petty offense' are terms of art, used in specific ways in decisions of the United States Supreme Court interpreting the Sixth Amendment." 52 Kan. App. 2d at 701. Essentially, a constitutional right to a jury trial exists if the authorized maximum penalty for a crime is greater than six months in jail. 52 Kan. App. 2d at 701-02. If an offense carries a maximum penalty of six months in jail or less, the court presumes that the offense is petty. *Blanton v. City of North Las Vegas, Nevada*, 489 U.S. 538, 542-43, 109 S. Ct. 1289, 103 L. Ed. 2d 550 (1989).

The City charged Grasty with violating Wichita Municipal Code § 5.68.010(1)(c). The violation carried a maximum term of imprisonment of six months. Thus, we presume her crime is a petty offense for constitutional purposes. See *Woolverton*, 52 Kan. App. 2d at 702-03. But this is a rebuttable presumption. *Blanton*, 489 U.S. at 543 ("A defendant is entitled to a jury trial in such circumstances only if he can demonstrate that any additional statutory penalties, viewed in conjunction with the maximum authorized period of incarceration, are so severe that they clearly reflect a legislative determination that the offense in question is a 'serious' one.").

In *Woolverton*, this court found that a defendant charged with misdemeanor domestic battery did not have a constitutional right to a jury trial even though the court could also fine the defendant between $200 and $500 or order the defendant to undergo domestic-violence-offender assessment and follow its recommendations. Nor was the possibility of the court imposing up to two years of probation or imposing costs for the assessment enough to trigger a constitutional right to a jury trial. 52 Kan. App. 2d at 703.

Similarly, this court has found that collateral consequences to the conviction are not enough to trigger a constitutional right to a jury trial. For example, the defendant in *Woolverton* argued that federal law prohibited domestic-violence offenders from purchasing firearms. But this court noted that the question is how the Kansas Legislature

12

views the crime of conviction, not what penalties or prohibitions the federal government imposes as a result of the conviction. 52 Kan. App. 2d at 704.

Here, the additional statutory penalty includes a fine of up to $1,000. Wichita Municipal Code § 5.68.010(2). This additional fine alone is not enough to find that Grasty had a constitutional right to a jury trial. See *United States v. Nachtigal*, 507 U.S. 1, 2, 5, 113 S. Ct. 1072, 122 L. Ed. 2d 374 (1993) (holding that a $5,000 fine was not enough to trigger a constitutional right to a jury trial for a crime with a maximum penalty of six months' imprisonment). But Grasty argues that other possible collateral consequences, such as deportation and other immigration issues, should transform her petty offense to a serious offense. In support, she cites *Bado v. United States*, 186 A.3d 1243, 1246-47 (D.C. Cir. 2018), where the District of Columbia Court of Appeals held that the potential deportation was a severe enough consequence that the defendant was entitled to the constitutional right to a jury trial.

The prosecution charged Bado with three counts of misdemeanor sexual abuse of a minor, and Bado requested a jury trial which was denied. After a bench trial, the court convicted Bado on one count, sentenced him to 180 days' imprisonment, ordered him to register as a sex offender, and pay fines and fees. As a result of his conviction, the United States began deportation proceedings against him.

On appeal, the court considered whether Bado's impending deportation entitled him to a jury trial. In doing so, the court examined the *Blanton* opinion, noting that in *Blanton*, the United States Supreme Court held that a right to jury trial may exist "'if [the accused] can demonstrate that any additional statutory penalties, viewed in conjunction with the maximum authorized period of incarceration, are so severe that they clearly reflect a legislative determination that the offense in question is a "serious" one.'" *Bado*, 186 A.3d at 1249 (quoting *Blanton*, 489 U.S. at 543). The court also noted that a court only considers "those potential penalties that are actually faced by the particular

13

defendant" when determining whether it classifies an offense as serious. *Bado*, 186 A.3d at 1249.

As to the specific case before the court in *Bado*, the court reasoned that "[l]ike incarceration, deportation separates a person from established ties to family, work, study, and community." 186 A.3d at 1250. The court considered the forced physical separation akin to the severity of the loss of liberty a defendant faces while incarcerated. The court also recognized that for many immigrants, removal is seen as worse than incarceration. 186 A.3d at 1250-51.

The court considered four arguments by the government and found them all lacking. First, the government argued that deportation is not a penalty for a criminal conviction. The court disagreed, essentially finding because it was the criminal conviction that terminated his asylum proceedings and began his deportation proceedings that deportation was a penalty in Bado's particular case. 186 A.3d at 1252-53.

Second, the government argued that the court should not consider potential deportation because Congress enacted that penalty and not the governing body that designated the original offense. 186 A.3d at 1257-58. Again, the court disagreed, finding that "the seriousness of an offense is to be assessed by reference to objective standards— penalties—'resulting from state action, *e.g.*, those mandated by statute or regulation.'" 186 A.3d at 1257 (quoting *Blanton*, 489 U.S. at 543 n.8.) The court noted that only Congress can prescribe removal from the United States as a penalty for a criminal conviction and that there is no reason to exclude consideration of such a serious penalty because Congress imposed it rather than the local Legislature. *Bado*, 186 A.3d at 1257-58.

Third, the government argued that deportation is not a punishment for a crime based on longstanding precedent. The court discounted the government's argument

because the government pointed to cases that arose under different constitutional provisions inapplicable to this case. 186 A.3d at 1259-60.

Fourth, the government argued that there are often uncertainties on whether a conviction renders a defendant deportable that would make application difficult in some cases. Again, the court discounted the argument stating that its holding was clear: "the Sixth Amendment entitles a defendant to a jury trial if he is charged with a deportable offense, even if the maximum period of incarceration does not exceed six months." 186 A.3d at 1260. As for any confusion or difficulty determining whether a conviction renders a defendant deportable, the court noted that the "statutory basis for the deportation penalty is readily ascertainable" and that there is a plentitude of law on the issue. 186 A.3d at 1260-61.

The court found that "the penalty of deportation, when viewed together with the 180-day maximum period of incarceration for misdemeanor sexual abuse of a minor, overcomes the presumption that appellant was charged with a petty offense and triggers the Sixth Amendment right to a trial by jury." 186 A.3d at 1262. The New York Court of Appeals reached a similar conclusion. See *People v. Suazo*, 32 N.Y.3d 491, 507, 93 N.Y.S.3d 629, 118 N.E.3d 168 (2018) (applying *Bado* and holding that a defendant facing deportation as a result of his misdemeanor conviction converted the petty offense into a serious offense).

The question before this court then is whether Grasty had a constitutional right to a jury trial given her assertion that the government could deport her as a result of her conviction.

The State argues that we should not consider collateral consequences, e.g., consequences found outside the statute of conviction, when determining whether a defendant is entitled to a jury trial. But the United States Supreme Court tacitly endorsed

15

the concept of considering collateral consequences when it considered whether a driver's license suspension, resulting from a driving under the influence (DUI) conviction but found in a statute different from the crime of conviction, was a severe enough penalty to rebut the presumption that the DUI conviction was a petty offense. See *Blanton*, 489 U.S. at 544 n.9. The State's argument that convictions often lead to collateral consequences, such as divorce and loss of a job, is inapplicable because the United States Supreme Court was also clear to note that "only penalties resulting from state action, *e.g.*, those mandated by statute or regulation, should be considered." 489 U.S. at 543 n.8. And as the *Bado* court noted, *Blanton* does not exclude consideration of penalties imposed by some legislative body other than the one who enacted the crime of conviction. *Bado*, 186 A.3d at 1258.

But this court has held that the imposition of additional penalties by other legislative bodies does not matter when considering whether an offense is petty or serious. *Woolverton*, 52 Kan. App. 2d at 704. Moreover, this court previously held that "[c]ollateral consequences are not considered when determining whether a jury-trial right exists." 52 Kan. App. 2d at 704. Still, as already mentioned, the United States Supreme Court considered the collateral consequence of driver's license suspension as a result of a DUI in *Blanton*, even if the Court ultimately held that suspension was not enough to transform the DUI charge into a serious offense. *Blanton*, 489 U.S. at 544 n.9.

As to this court's holding that it should not consider penalties imposed by other legislative bodies when determining whether an offense is petty or serious, the United States Supreme Court focuses solely on one legislative body. This is most easily seen when the Court discusses the additional statutory penalties that the defendant in that case faced. After considering the additional statutory penalties, the *Blanton* Court did "not believe that the *Nevada Legislature* has clearly indicated that DUI is a 'serious' offense." (Emphasis added.) 489 U.S. at 544. The Court noted that such considerations "should ensure the availability of a jury trial in the rare situation where *a legislature* packs an

16

offense it deems 'serious' with onerous penalties" even if the offense has a maximum term of incarceration of six months or less. (Emphasis added.) 489 U.S. at 543. In both passages, the Court focused on the single legislative body that enacted the statute setting out the offense. The Court did not consider whether additional penalties may be present based on the action of some other legislative body. 489 U.S. at 543-44.

But the Court's silence on the issue may have stemmed from the parties not discussing consequences resulting from the action of some other legislative body. Or it could have been that there were no collateral consequences as a result of the action of another legislative body to discuss. As it stands, the *Blanton* opinion does not specifically endorse or foreclose considering collateral consequences imposed by Legislatures other than the one who enacted the crime of conviction.

Given the *Blanton* opinion's focus on the penalties that a defendant faces as a result of their conviction, we consider all the penalties, imposed by state action, that a defendant faces as a result of their conviction when determining whether the defendant has a right to a jury trial for an offense presumed to be petty. If the government could deport Grasty because of a conviction for selling sexual services, then she should have a constitutional right to a jury trial. See *Bado*, 186 A.3d at 1262.

But there is no indication here that the federal government could deport Grasty because of her conviction. Her motion in response to the State's motion to deny jury trial merely posits that Grasty "may suffer the collateral consequences of the penalty of deportation or other immigrations trouble." Nor did Grasty offer any proof, whether through citation to federal statutes that would render her deportable because of her conviction or anecdotal proof that the government had started deportation proceedings or other immigration consequences against her as a result of her arrest and later conviction. In *Bado*, the possibility of deportation was very real and brought to the attention of the court. 186 A.3d at 1247.

17

Without more information on Grasty's status, it is hard to say whether Grasty faces deportation as a result of her conviction. She would not be deportable under 8 U.S.C. § 1227(a)(2)(A)(i) (2018) for committing a crime of moral turpitude because her sentence could not be longer than one year. Whether some other provision in the immigration laws and regulations would render her deportable is not discussed by the parties.

Ultimately, Grasty has not established that deportation is a real possibility. If the government can deport her because of her conviction, then she may have the right to a jury trial. But if the government cannot deport her, then the offense with which the prosecution charged her is considered petty and she would not be entitled to a jury trial. Because Grasty failed to establish a record that she was deportable because of her conviction, her argument that she was convicted of a serious offense fails. See *State v. Simmons*, 307 Kan. 38, 43, 405 P.3d 1190 (2017).

*There Was Sufficient Evidence to Support Grasty's Conviction.*

On appeal, Grasty argues that there was not sufficient evidence for a fact-finder to determine that she offered or agreed to sell manual stimulation of Molde's genitals.

*Our standard of review is whether a reasonable fact-finder could have found Grasty guilty beyond a reasonable doubt.*

"'When sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after reviewing all the evidence in a light most favorable to the prosecution, the appellate court is convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations.' [Citation omitted.]" *State v. Chandler*, 307 Kan. 657, 668, 414 P.3d 713 (2018).

18

*The district court believed Molde and disbelieved Grasty.*

In essence, Grasty's argument is that Molde's testimony and her testimony differed in some respects. She also acknowledges that this court does not reweigh the evidence or resolve evidentiary conflicts.

To be guilty of selling sexual relations, Grasty had to perform for hire, or offer, or agree to perform for hire, with an exchange of value, the manual or other bodily contact stimulation of the genitals of any person with the intent to arouse or gratify the sexual desires of the offender or another. Wichita Municipal Code § 5.68.010(1)(c).

Molde's testimony established that he offered to pay Grasty $60 for manual stimulation and that Grasty agreed to his offer. Grasty claimed that the language barrier led to confusion, but she made that argument to the district court and the district court found her explanation lacking. When viewed in a light most favorable to the prosecution, there was sufficient evidence for the district court to find Grasty guilty of selling sexual relations.

In sum, the district court did not err in denying Grasty's request for a jury trial. Her request was late, she did not provide enough information to establish that she had a constitutional right to a jury trial, and she failed to show that she would face undue hardship or prejudice by the district court enforcing the time limitation. Additionally, there was sufficient evidence to support her conviction.

Affirmed.

19