# State of New York
# Court of Appeals

MEMORANDUM

This memorandum is uncorrected and subject to revision before publication in the New York Reports.

No. 17
The People &c.,
   Respondent,
  v.
Cesar Garcia,
   Appellant

Mark W. Zeno, for appellant.
David M. Cohn, for respondent.

MEMORANDUM:

The order of the Appellate Term should be affirmed.

Defendant was originally charged with public lewdness, two counts of forcible touching, and two counts of sexual abuse in the third degree after police officers observed him masturbating on a subway platform and pressing himself against two women on a subway car. The People thereafter filed a prosecutor's information reducing the two class

A misdemeanor charges of forcible touching to attempted forcible touching, so that the top charges against defendant were Class B misdemeanors obviating his right to a jury trial under state statute (*see* CPL 340.40).[1]   After a bench trial, defendant was convicted of public lewdness and acquitted of all other charges.  The Appellate Term affirmed the conviction.  Applying our holding in *People v Suazo* (32 NY3d 491 [2018])—decided after defendant's conviction—the court held that defendant had not met his burden of establishing deportability based on the crimes for which he was tried (63 Misc 3d 158 [A]).

While the Appellate Term first improperly conducted the deportability analysis based only on the crime of conviction, that court went on to correctly analyze defendant's deportability based on all the charges he faced (*see Suazo*, 32 NY3d at 508).  It remained, however, "the defendant's burden to overcome the presumption that the crime charged is petty and establish a Sixth Amendment right to a jury trial" (*id.* at 507).  We agree with the Appellate Term that here, defendant's conclusory allegation that he was deportable if convicted "on any of the charged B misdemeanors," supported by a bare citation to 8 USC § 1227 (a) (2) (A) (ii), under which an alien is deportable if "convicted of two or more crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct," was insufficient to establish his right to a jury trial.

In *Suazo*, by contrast, defendant's assertion that "the possibility of deportation upon conviction rendered the class B misdemeanors sufficiently serious to mandate a jury trial

---

[1] Effective July 1, 2022, CPL 340.40 as amended now extends the right to a jury trial to all defendants charged with a misdemeanor offense in local criminal court (L 2021, ch 806).

under the Sixth Amendment" met his burden to show deportability because it was clear from the face of the accusatory instrument "that at least one of the charges lodged against him . . . qualified as a deportable offense" (32 NY3d at 494, 508).  Our dissenting colleague asserts that defendant's charges "required no greater analysis or piecing together of federal law than that in *Suazo*" (dissenting op at 9).  But the insufficiency of defendant's assertion is quite ably demonstrated by the dissent's "cursory review" of this issue, which spans pages of text and includes a 34-line footnote analyzing federal immigration law (dissenting op at 6-11, 10-11 n 1).  Holding this defendant to the standard we articulated in *Suazo*, as we do and the Appellate Term did below, does not create an "ambiguous and heightened burden," nor does it violate "the principle of *stare decisis*" (dissenting op at 2-3).

WILSON, J. (dissenting):

Charged with three B misdemeanor offenses and facing the threat of potential

deportation upon conviction, Cesar Garcia demanded a jury trial, informing the court that

"any of the charged B misdemeanors would result in deportability under 8 USC § 1227

(a)(2)(A)(ii)." Today, the majority holds his clear statement was insufficient to invoke his constitutional right to a jury trial, as recognized in *Suazo* (32 NY3d 491, 493 [2018]). Mr. Garcia's request is no less clear and no less accurate that Mr. Suazo's was, yet Mr. Garcia is denied the jury trial Mr. Suazo was granted.

In *Suazo*, we held that deportation constitutes a significant consequence of criminal conviction such that even for an otherwise petty offense, if the charges bear the potential for deportation upon conviction, a defendant is entitled to a jury trial under the Sixth Amendment (*id.*). I dissented in *Suazo* because federal law provides for deportation itself without a jury trial, hence the possibility of deportation cannot, in my view, confer the right to a jury trial where none otherwise exists (32 NY3d at 518). However, the principle of *stare decisis* is important; courts that overturn settled precedent simply because a court as currently composed would have decided the initial case differently are functioning as legislative bodies, not courts. "The doctrine of stare decisis provides that once a court has decided a legal issue, subsequent appeals presenting similar facts should be decided in conformity with the earlier decision" (*People v Bing*, 76 NY2d 331, 337 [1990]). Indeed, "the doctrine of *stare decisis* is of fundamental importance to the rule of law" (*Welch v Texas Dept. of Highways and Public Transp.*, 483 US 468, 494 [1987]). "Adherence to precedent promotes stability, predictability, and respect for judicial authority…For all these reasons, [the United States Supreme Court] will not depart from the doctrine of *stare decisis* without some compelling justification" (*Hilton v South Carolina Public Railways Commn.*, 502 US 197, 202 [1991]). Our Court has recognized that *stare decisis* "promotes predictability in the law, engenders reliance on our decisions, encourages judicial restraint

and reassures the public that our decisions arise from a continuum of legal principle rather than the personal caprice of the members of this Court" (*People v Peque*, 22 NY3d 168, 194 [2013]). Wrong though I believe *Suazo* to be, my duty is to follow it.

The majority follows *Suazo,* but only to a point. I agree with the majority that *Suazo* requires a court to determine a person's deportability based on the crimes with which the defendant is charged—not those for which the person was ultimately convicted. I also agree with the majority's recognition that *Suazo* governs this case, inasmuch as *Suazo*'s Constitutional rule applies to all pending cases as a substantive requirement of constitutional criminal procedure (*see Griffith v Kentucky*, 479 US 314, 328 [1987]). However, the majority's creation of an ambiguous and heightened burden to invoke a defendant's Sixth Amendment right to a jury in this context is incompatible with *Suazo*. Because Mr. Garcia supported his motion with the clear and accurate statement that if he were convicted of any of the charged B misdemeanor crimes, he would face the potential of deportation, his conviction after a bench trial violated his constitutional rights.

I.

On June 25, 2015, an undercover police officer standing on the northbound 4 train platform at Union Square observed Mr. Garcia with his hand in his pants pocket. Mr. Garcia appeared to be masturbating. After approximately 10 minutes, the officer followed Mr. Garcia onto an arriving train, where he pushed "his groin up against a woman's buttocks and repeatedly rub[bed] against her." He then departed that train and boarded a different, southbound train. The officer again followed him and observed Mr. Garcia push his groin into a second woman.

Mr. Garcia was subsequently charged with two counts of forcible touching (PL 130.52), two counts of sexual abuse in the third degree (PL 130.55), and one count of public lewdness (PL 245). Prior to trial, the people moved to reduce the charges to B misdemeanors. Mr. Garcia then moved for a jury trial. In the affirmation and memorandum of law supporting the motion, his counsel disclosed that Mr. Garcia was a non-citizen and stated that "any of the charged B misdemeanors would result in deportability under 8 USC § 1227 (a)(2)(A)(ii)." Mr. Garcia cited to *Blanton v City of North Las Vegas* (489 US 538 [1989]) and *Padilla v Kentucky* (559 US 356 [2010]) to argue that deportation constitutes a severe statutory penalty, rendering the charges serious offenses that warranted a jury trial. Mr. Garcia's motion and supporting papers were filed well before we decided *Suazo*.

In the in-court colloquy, the People relied on *People v Urbaez* (10 NY3d 773 [2008]) to assert their right to reduce the charges to B misdemeanors to avoid giving Mr. Garcia a jury trial. The People did not dispute Mr. Garcia's contention that his conviction of any of the B misdemeanors would render him subject to deportation. Although the Trial Court described Mr. Garcia's argument as "interesting," it denied the application "based upon the fact that I believe that the Court of Appeals, at least at this stage, has said that the People have broad discretion in reducing these cases and moving forward on a bench trial." However, the court noted that the issue "may ultimately resolve in defense favor if the definition of serious is looked at as more than just potential incarceration." After a bench trial, the trial court acquitted Mr. Garcia of the forcible touching and sex abuse charges but convicted him of public lewdness. Mr. Garcia was sentenced to seven days of community

service with a $200 mandatory surcharge and a $50 DNA fee. He was subsequently deported.

While Mr. Garcia's case was on appeal, we decided *People v Suazo* (32 NY3d at 491). The Appellate Term invited the parties to submit supplemental briefing on the application of *Suazo* to the case at bar. The People argued that defendant failed to meet his burden under *Suazo* to show that he would be deportable if convicted because whether public lewdness is a crime involving moral turpitude (CIMT) is an unsettled question. Mr. Garcia countered that *Suazo* entitled him to a jury trial and that his sentence should be vacated. He further argued that the People had not preserved any argument about the charged crimes not posing a threat of deportation, because they could have disputed that proposition when Mr. Garcia raised it. Mr. Garcia also argued that affirming on the People's newly advanced ground would violate *People v LaFontaine* (92 NY2d 470 [1998]).

The Appellate Term held that Mr. Garcia was not entitled to a jury trial because "he failed to meet his burden to establish that a conviction for public lewdness carries the potential for deportation." The Appellate Term also accepted the People's arguments that (a) even if public lewdness is a CIMT, 8 USC § 1227 (a) (2) (A) (ii) requires conviction of two or more CIMTs, and (b) the charged offenses arose out of a single scheme of criminal misconduct and so would not have rendered him deportable. Mr. Garcia appeals.

II.

In *Suazo*, we held that the Sixth Amendment of the U.S. Constitution, which "guarantees that a defendant will be judged by a jury of peers if charged with a serious crime," entitles a noncitizen defendant charged with a crime carrying the potential penalty of deportation to a jury trial (32 NY3d at 493). The majority and I agree that *Suazo* applies to Mr. Garcia and that, if he was charged with crimes carrying the potential for deportation, he was entitled to a jury trial and his conviction must therefore be reversed. The sole issue presented is whether Mr. Garcia met his burden in his motion for a jury trial to alert the court of the potential for deportation were Mr. Garcia to be convicted of the B misdemeanors with which he was charged.

In *Suazo,* we explicitly recognized that our holding would "obligate New York courts. . . to determine the potential immigration consequences associated with pending charges" (*id.* at 507). Responding to the People's concerns for the "practicalities of litigating a defendant's immigration status" we explained "that it is the defendant's burden to overcome the presumption that the crime charged is petty and establish a Sixth Amendment right to a jury trial" (*id.*). Nonetheless, we noted that where parties disagree, the courts would need to weigh in on the matter, but that "our courts are competent to resolve such questions as they are presented" even at the cost of some judicial efficiency (*id.*).

In *Suazo*, we did not expressly elaborate on what a defendant must allege—exactly how much proof or reasoning a defendant must provide—to meet this burden. Still, Mr. Suazo's submission to the trial court, arguing that he faced the potential for deportation, is

both instructive and binding. The majority's deviation from that precedent is obvious when comparing Mr. Suazo's allegation, which we held legally sufficient to entitle him to a reversal of his conviction, with Mr. Garcia's, which the majority now holds is insufficient:

| Mr. Suazo | Mr. Garcia |
|---|---|
| "Regardless of whether he is charged with A or B misdemeanors, Mr. Suazo faces the possibility of a sentence far harsher than that of mere incarceration. As a non-citizen, should Mr. Suazo be convicted of any of the misdemeanors for which he is charged, Mr. Suazo will be deportable." | "Despite the maximum period of incarceration for each of the counts being less than 6 months in the instant matter, Mr. Garcia is entitled to a jury trial because the charges against him constitute a 'serious' offense due to the immigration consequences of a conviction on each of the charges. The Immigration and Nationality Act (INA) provides that a noncitizen 'is deportable' and 'shall, upon the order of the Attorney General, be removed' from the United States upon conviction of any crime listed in 8 U.S.C. § 1227 (a) (2), including: certain 'crimes involving moral turpitude'. . . . Mr. Garcia is a non-citizen for whom conviction on any of the charged B misdemeanors would result in deportability under 8 U.S.C. § 1227 (a)(2)(A)(ii). See, *Muhurv v Tryon*, 11-CV-539A, 2011 WL 601 6606 (WDNY Dec. 2, 2011) (same for P.L. *§* 130.52); *Purveegiin v. U.S. I.N.S. Processing Ctr.*, 73 F Supp 2d 411, 414 (SDNY 1999) (same for P.L. § 130.55)." |

Indeed, in *Suazo* we accurately described Mr. Suazo's request for a jury trial as "assert[ing] that he was a noncitizen charged with deportable offenses, and . . . argu[ing] that the possibility of deportation upon conviction rendered the class B misdemeanors sufficiently serious to mandate a jury trial under the Sixth Amendment" (32 NY3d at 494). *Mr. Suazo cited no federal law, nor did his memorandum of law contain additional analysis on*

*deportability to support the above-quoted statement.* Nonetheless, we held that his motion was sufficient to trigger our scrutiny, ultimately resulting in our holding that at least one of the crimes with which he was charged could render a noncitizen deportable (*id.*). Accordingly, we found Mr. Suazo was entitled to a new trial (*id.* at 509).

As is patent from the above side-by-side comparison, Mr. Garcia substantially exceeded that threshold. Mr. Garcia asserted he was a noncitizen "for whom conviction on any of the charged B misdemeanors would result in deportability under 8 U.S.C. § 1227 (a)(2)(A)(ii), including: certain 'crimes involving moral turpitude'" and cited two federal immigration cases. In the first, *Muhury v Tryon*, the defendant challenged his immigration detention when immigration authorities commenced removal proceedings after his conviction for forcible touching (PL § 130.52), which the immigration court determined was a crime involving moral turpitude (11-CV-539A, 2011 WL 6016606, *1 [WDNY Dec. 2, 2011]). In the second, *Purveegiin v U.S. I.N.S. Processing Ctr.*, the defendant also sought release from immigration detention initiated when he was deemed eligible for deportation after conviction for crimes involving moral turpitude, including third-degree sexual abuse (PL § 130.52) (73 F Supp 2d 411, 414 [SDNY 1999]). If Mr. Suazo's allegation, containing no citation or authority at all, was sufficient to trigger his right to a jury trial, Mr. Garcia, whose claim was far more robustly stated and supported, must also have met the threshold required to raise the issue.

The difference between the charges against Mr. Suazo and Mr. Garcia does not affect the threshold requirement each defendant was entitled to meet. In 2018, when we

decided *Suazo*, as now, the Immigration and National Act (INA) provides that a noncitizen may face deportation for conviction for a variety of crimes (8 USC § 1227 [a] [2] [A]). Most relevant to Mr. Suazo's charges, a noncitizen becomes deportable after conviction of any crime of domestic violence, defined as "any crime of violence…against a person committed…by an individual with whom the person shares a child in common" (8 USC § 1227 [a] [2] [E] [i]). Mr. Suazo was charged with several crimes but was not explicitly charged with any "domestic violence" offense—rather, to become deportable, Mr. Suazo's crimes needed to have occurred in circumstances that meet the domestic violence definition provided in the INA (8 USC § 1227 [a] [2] [E] [i]). Mr. Suazo offered no statement meeting that definition; instead, he nakedly asserted that a conviction would render him deportable for any of his offenses. Nonetheless, our Court proceeded to do exactly that analysis, citing federal immigration cases and New York law to hold that one of the charges—criminal obstruction of breathing or blood circulation—was violent and would qualify, under the circumstances, as a crime of domestic violence rendering a noncitizen deportable (32 NY3d at 508-509). Thus, in *Suazo*, in which some amount of legal analysis was needed to determine if the charges fell within the INA's enumerated crimes triggering deportability, we did not require the defendant to make any specific argument to that effect.

Mr. Garcia's charges required no greater analysis or piecing together of federal law than that in *Suazo*. Most relevant to Mr. Garcia, the INA provides that a noncitizen may be deported or face forcible removal from the country after conviction for "two or more crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct" (8

USC § 1227 [a] [2] [A] [ii]). Mr. Garcia's circumstances would render him deportable in

the event he was convicted of two or more crimes considered to be crimes of moral

turpitude and not arising out of a single scheme of criminal misconduct. Thus, just like Mr.

Suazo, who would only face deportation if his charges met particular circumstances

provided for in federal law, Mr. Garcia's deportability depended on a determination of

whether his charges are crimes of moral turpitude and if they occurred in a single scheme

of criminal misconduct. This determination is no more or less complicated a task than that

the Court accepted in *Suazo* with only a bare statement from Mr. Suazo that he would be

deportable if convicted of any of his charges. Mr. Garcia, who cited two cases of federal

law, went further.[1] The majority provides no reason for distinguishing between the two

---

[1] Even a cursory review of relevant federal law confirms support for Mr. Garcia's
allegation that his crimes could be considered crimes of moral turpitude not committed in
a single scheme of criminal misconduct. The Board of Immigration Appeals interprets the
"single scheme" language to mean "that when an alien has performed an act, which, in
and of itself, constitutes a complete, individual and distinct crime, he is deportable when
he again commits such an act, even though one may closely follow the other, be similar
in character, and even be part of an overall plan of criminal misconduct" (*Matter of
Adetiba*, 20 I & N Dec 506, 509 [BIA 1992]). In contrast, there is a single scheme of
criminal misconduct "where one crime constituted a lesser offense of another, … where
the two crimes flow from and are the natural consequence of a single act of criminal
misconduct," or where there is "no substantial interruption that would allow the
participant to associate himself from his enterprise and reflect on what he has done" (*id*).
    In *Matter of Islam*, the BIA held that its interpretation of the "single scheme"
provision is controlling and should be uniformly applied in all circuits throughout the
country (25 I & N Dec 637, 641 [BIA 2011]). In applying *Adetiba*, Federal Courts, which
afford *Chevron* deference to the BIA's interpretation of the Immigration and Nationality
Act (*see Michel v INS*, 206 F3d 253, 262 [2d Cir 2000]), have interpreted the single
scheme exception very narrowly. For example, the Fourth Circuit affirmed an order of
deportation where the appellant was convicted of two separate crimes for passing two
fraudulent checks at two different stores in a mall during a single shopping trip
(*Akindemowo v US INS*, 61 F3d 282 [4th Cir 1995]). Similarly, in *Szonyi v Whitaker*, the
Ninth Circuit affirmed the BIA's determination that the appellant's multiple convictions

analyses and requiring significantly more from Mr. Garcia than we did of Mr. Suazo. The

doctrine of *stare decisis* compels us to decide Mr. Garcia's case as we did Mr. Suazo's. [2]

### III.

Having undermined the only precedent available to defendants confronting charges

bearing the potential for deportation (*Suazo*), it is impossible to discern what the majority

would find sufficient for noncitizen defendants to say to meet their burden. What exactly

Mr. Garcia must have shown in order to carry his burden is utterly unmentioned in the

majority's brief memorandum decision, leaving future defendants only to wonder what it

is they must submit to a court in order to vindicate their Constitutional right to a jury of

their peers. Perhaps the majority would have been satisfied had Mr. Garcia stated that the

---

for sexual offenses committed against three women in the same location over the course of a five to six hour window following a bout of heavy drinking did not constitute a single scheme because "the acts, though similar in character, were distinct, because the commission of one can occur without the commission of the other" (915 F3d 1228, 1256 [9th Cir 2019]). In *Chavez-Alvarez v Attorney Gen. United States*, the Third Circuit held that two convictions—the first for sodomy and the second for making false statements seven hours later about whether the defendant committed sodomy—did not arise out of a "single scheme" of criminal misconduct (850 F3d 583, 587 [3d Cir 2017]). Likewise, Mr. Garcia was charged with two counts of sexual abuse based on separate incidents involving different victims occurring at different locations, each of which could occur without the commission of the other. I conclude that the charged offense carried a potential penalty of deportation and so Mr. Garcia should have been afforded a jury trial.

[2] The majority's complaint about the length of the immediately preceding paragraph and footnote conflates two things: whether Mr. Garcia said at least as much as Mr. Suazo, thus entitling him to a jury trial, and the thoroughness with which I will write to demonstrate how wrong the majority is. It turns out I could have written much less, because the majority has no substantive disagreement with that paragraph or footnote. Its only response is to invent a new category of rhetorical device (beyond logos, ethos and pathos) in which the thoroughness of an explanation proves its error. Perhaps we can call it "diligentos," on the off chance someone wishes to use it henceforth.

charged crimes were ones involving moral turpitude instead of citing federal law establishing just that. Two reasons counsel against that requirement. First, the holding would in fact announce no rule at all. Little is clear about how much Mr. Garcia would need to argue or how he would have needed to support that assertion and for other defendants facing any of the litany of enumerated crimes triggering deportability in the INA, how far each might need to argue or link up the logical steps leading to deportability would be impossible to predict. Second, requiring a stricter standard of proving a particular likelihood of deportability, for example here that a federal court would probably or definitively have found Mr. Garcia's crimes to be ones of moral turpitude undercuts the emphasis we placed in *Suazo* on the "potential" and not certainty of deportation triggering the right to a jury trial (32 NY3d at 493, 507). That distinction is important—requiring certainty in an area that evolves and changes as frequently as discretionary federal decision making under immigration law would create a standard so exacting that few defendants would ever meet it. The inevitable ambiguity surrounding immigration consequences of state convictions should cut in favor of defendants—not against.

Perhaps the majority would have required Mr. Garcia to anticipate and refute the People's unpreserved argument (made for the first time on appeal, not at trial)[3] that his

---

[3] In countless other cases, the People regularly argue both procedural bars (such as preservation and insufficiency of motion papers) doom a defendant's claim and, in the alternative, that a defendant's argument fails on the merits. Indeed, in the Appellate Term in this instance, the People did exactly that. There is no reason the People could not have argued, in response to Mr. Suazo's request for a jury trial, that the B misdemeanor charges constituted a single scheme for federal immigration law purposes, so that even if he were right that the potential for deportation entitled him to a jury trial, he was not facing deportation because federal law requires two convictions not arising from a single scheme.

crimes constituted a single scheme of criminal misconduct. Again, to require such a detailed anticipation of a counterargument, particularly given the long list of crimes triggering deportability under the INA, would provide no guidance to future litigants who may also wonder what possible counterarguments they are now also required to assert in the first instance. Nor would any purpose of judicial efficiency be furthered. If the People find a counterargument to deportability in the INA statute, such as the occurrence of crimes of moral turpitude in a single scheme, it in fact furthers the Court's own aims of efficiency and the adversarial system to require the People to raise and preserve that argument, lest omnibus motions take on even greater length as defendants attempt to anticipate every possible counterargument in immigration law.

Besides the difficulty of imagining the requirements of the majority's new rule and the policy reasons undergirding it, which for the reasons above I question, one compelling reason exists to keep the burden of noncitizen defendants seeking to invoke their constitutional right to a jury trial realistic and feasible: the importance of the right. In *Suazo,* we explained:

> "[t]here can be little doubt that deportation is a sufficiently severe penalty to puncture the six-month demarcation between serious and petty offenses because the loss of liberty associated therewith is analogous to that inherent in incarceration and because deportation—which may result in the indefinite expulsion from the country and isolation from one's family— is frequently more injurious to noncitizen defendants than six months or less of imprisonment" (*id.* at 500).

---

The People chose not to do so, instead standing on their argument that no jury trial right attached to B misdemeanors, regardless of the deportation consequences.

Such an important consequence and attendant constitutional right as trial by jury should not depend on an ambiguous or unnecessarily exacting procedural standard for invocation. Because I cannot see, and the majority does not provide, any basis to deviate from *Suazo*, I dissent.

Order affirmed, in a memorandum. Chief Judge DiFiore and Judges Garcia, Cannataro, Troutman and Winslow concur. Judge Wilson dissents in an opinion, in which Judge Rivera concurs. Judge Singas took no part.

Decided May 24, 2022